**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

EON SHEPHERD,

                         Plaintiff,

              v.                                          No. 9:15-CV-0665
                                                         (GLS/CFH)
SUPERINTENDENT SMITH, et al.,

                         Defendants.


**APPEARANCES:**                            **OF COUNSEL:**

Eon Shepherd
96-A-0356
Sullivan Correctional Facility
Box 116
Fallsburg, New York 12733
Plaintiff pro se

Attorney General for the                    DENISE P. BUCKLEY, ESQ.
    State of New York                        Assistant Attorney General
The Capitol
Albany, New York 12224
Attorney for Defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

        Plaintiff pro se Eon Shepherd ("plaintiff"), an inmate who was, at all relevant times, in the custody

of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action

pursuant to 42 U.S.C. § 1983, alleging that Superintendent ("Supt.") Smith, Deputy Superintendent of

Programs ("DSP") Andrews, Lieutenant ("Lt.") Gardner, Lt. Palen, Sergeant ("Sgt.") Keane, Sgt. Lelleck,

---

[1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C.
§ 636(b) and N.D.N.Y. L.R. 72.3(c).

Sgt. Deacon, Doctor ("Dr.") Lee, Corrections Officer ("C.O.") S. Alagrin, C.O. Strang, C.O. Lange, C.O. Morgenthaler, C.O. Pearson, C.O. Eric Hoffman, C.O. Zibler, C.O. Blyth, C.O. Heister, C.O. Phillips, C.O. Marasco, Food Administrator Rapp – who at all relevant times were employed at Shawangunk Correctional Facility ("Shawangunk") – violated his constitutional rights under the First, Eighth, and Fourteenth Amendments. Dkt. No. 86 ("Am. Compl.").[2] Presently pending before the Court is defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Dkt. No. 107. Plaintiff opposed defendants' motion. Dkt. No. 113. For the following reasons, it is recommended that defendants' motion be granted in part and denied in part.

### I. Background

### A. Plaintiff's Recitation of the Facts

The facts are related herein in the light most favorable to plaintiff as the nonmoving party. See subsection II.A infra.

### 1. First Amendment Free Exercise/Fourteenth Amendment Equal Protection

When plaintiff transferred to Shawangunk in July 2013, he wrote DSP Andrews, and requested access to the weekly Rastafarian religious worshiping service. Am. Compl. ¶ 36. After finding out no such worshiping service existed, plaintiff wrote letters to and spoke with Supt. Smith and DSP Andrews regarding the implementation of such religious services, and both men responded that they would look into it. Id. Plaintiff filed a grievance, and the IGRC informed him that the Rastafarian religion had an approved facilitator within the jail, and that a room was reserved every Tuesday evening for classes and services. Id.

---

[2] Both parties frequently interchange the spellings of various defendants names. The undersigned refers to the following defendants' names as they are spelled in their declarations: (1) C.O. Strang; (2) C.O. Lange; (3) C.O. Marasco; and (4) C.O. Blyth. See Dkt. Nos. 109-2, 109-11, 109-14.

Plaintiff was unable to worship in the weekly class, as it the religious services requires different and more elaborate items. Id. On his arrival at Shawangunk, plaintiff also made Supt. Smith, DSP Andrews, and Mr. Rapp, the food administrator, aware that he had been approved for a Cold Alternative Diet ("CAD") for religious purposes. Id. ¶ 37. Supt. Smith, DSP Andrews, and Mr. Rapp failed to respond to plaintiff's correspondence. Id. Plaintiff again wrote Supt. Smith, DSP Andrews, and Mr. Rapp, and informed them that they were violating his religious rights by not providing him a CAD meal. Id. Plaintiff did not receive a response. Id. Instead, staff issued plaintiff regular meals, which he could not eat due to his religious dietary restrictions. Id.

Plaintiff spoke with DSP Andrews "on numerous occasions" regarding his failure to receive CAD meals, lack of Rastafarian services, and his access to the law library. Am. Compl. ¶ 54. DSP Andrews assured plaintiff that he would look into these issues, but no other measures were taken. Id. Mr. Rapp stated that he was unaware plaintiff was not receiving CAD meals, but still did not take corrective measures to ensure that plaintiff received his religious meals. Id. ¶ 55.

## 2. First Amendment Retaliation

On October 7, 2013, Sgt. Keane ordered plaintiff to come out of his cell and speak with him in a "loud threatening [sic] and aggressive manner." Am. Compl. ¶ 14. Plaintiff refused, and Sgt. Keane threatened to issue plaintiff a misbehavior report. Id. Plaintiff agreed to meet with him, and Sgt. Keane threatened to physically harm him, falsely plant contraband in his cell, and place him in the Special Housing Unit if continued to file grievances. Id. Sgt. Keane also warned plaintiff not to grieve the current conversation. Id. On October 24, 2013, Sgt. Keane again pulled plaintiff from his cell and verbally harassed and "threatened to physically harm [him]" if he continued writing grievances. Id. ¶ 15. Plaintiff returned to his cell to find his property in disarray, and several legal documents missing. Id. ¶ 16. Later that day,

3

plaintiff asked C.O. Alagrin about his missing legal documents.  Id. ¶ 17.  C.O. Alagrin denied taking plaintiff's documents, and threatened physical harm to plaintiff if he did not stop writing grievances.  Id.  On or about November 22, 2013, C.O. Morgenthaler stated that plaintiff would continue to receive misbehavior reports for as long as he was housed in his unit, and that the corrections staff would "get [him] for filing grievances and lawsuits against them."  Am. Compl. ¶ 23.  Sometime after plaintiff's conversation with C.O. Morgenthaler, plaintiff received a misbehavior report for an unidentified infraction.  Id. ¶ 24.

Lt. Gardner repeatedly submitted requests for plaintiff to undergo urinalysis testing, and approved his own request against DOCCS policy, in order to harass and retaliate against plaintiff.  Am. Compl. ¶ 50. C.O. Morgenthaler also requested that plaintiff undergo urine testing in retaliation for plaintiff's filing grievances against him.  Id.

Plaintiff alerted Supt. Smith through written communications and in person that Shawangunk staff retaliated against him for filing grievances and lawsuits.  Am. Compl. ¶ 53.  Supt. Smith verbally assured plaintiff that he would look into the issues, but he took no corrective measures.  Id.

### 3. First Amendment Access to the Courts

On May 2, 2014, C.O. Marasco and an unnamed officer searched plaintiff's cell while he was at recreation.  Am. Compl. ¶ 32.  C.O. Marasco called plaintiff an "asshole," and stated that corrections officers, who he did not identify, had a plan to "set [plaintiff] up when [he] least expect[ed] it."  Id.

During his keeplock confinement, plaintiff made numerous requests to the law library to access legal materials and information in order to litigate a case in the Court of Claims, two Article 78 petitions, and a post-conviction motion.  Am. Compl. ¶ 38.  C.O. Heister, C.O. Lange, and C.O. Morgenthaler picked up these request slips at plaintiff's cell.  Id.  Plaintiff never received an acknowledgment or response from the law library.  Id.  Plaintiff submitted grievances; wrote letters to, and verbally communicated with, Supt.

Smith; and "made the officials in Albany aware" that he was denied access to the law library. Id. From August 2013 until January 2014, plaintiff only received access to the law library five times, and never received the legal materials he requested that were necessary to litigate his cases. Id. ¶ 39. Plaintiff made daily requests for access to the law library, and he finally received his materials on October 3, 2013; October 7, 2013; and December 5, 2013. Id. Plaintiff received access to a notary on February 5, 2014 after he provided proof to C.O. Pearson that he had an upcoming court deadline. Id. Plaintiff was permitted to sign up for access to the law library on February 1, 2014; February 7, 2014; and February 9, 2014, but he was never placed on the call out list, and, therefore, did not access the library on those occasions. Id. On March 6, 2014, plaintiff received a call out for the law library, but C.O. Pearson instructed him to instead attend his ASAT program, and informed plaintiff that he would let him know when he could next visit the library. Id. C.O. Pearson never contacted plaintiff. Id. C.O. Pearson told plaintiff that if plaintiff wrote grievances concerning the law library, he would make it difficult for him to access. Id. ¶ 40. Plaintiff was ultimately prevented from appealing two Article 78 decisions, and litigating his post-conviction motions, as he never received the forms or case law he needed. Id. ¶ 41. Moreover, Sgt. Keane, C.O. Alagrin, and C.O. Marasco destroyed legal documents associated with plaintiff's post-conviction motions. Id.

### 4. Eighth Amendment Sexual Assault and Excessive Force

On September 24, 2013, C.O. Strang pat-frisked plaintiff in a "rough aggressive manner," and "grabbed [his] penis, and testicles, squeezing them so hard" that plaintiff cried out in protest. Am. Compl. ¶ 9. C.O. Strang threatened to sexually assault plaintiff if he did not stop filing grievances, and ran "his hand between [plaintiff's] buttocks cheeks to his anal hole roughly applying pressure." Id. Plaintiff continued on to keeplock exercise, and when he returned to his cell later in the day, C.O. Strang stated that "it was only a matter of time before he and his fellow officers beat [plaintiff] down due to the grievances." Id. Plaintiff

5

sought medical treatment for the pain and swelling in his groin area.  Id.

On October 25, 2013, prior to plaintiff entering keeplock exercise, C.O. Alagrin pat-frisked him and "forcefully grabbed [his] hair [and] search[ed] it in an aggressive manner, pulling roughly . . . [and] tearing, and ripping out [his] hair." Am. Compl. ¶ 18.  Plaintiff protested, stating that touching and pulling his hair was a violation of his religion beliefs.  Id.  C.O. Alagrin told plaintiff to "shut the fuck up" and head to the yard.  Id.  On November 9, 2013, C.O. Alagrin again pat-frisked plaintiff and searched his hair in a "rough manner, pulling/yanking on [his] hair[, and] tearing/ripping several dreadlocks out."  Id.  Plaintiff again informed C.O. Alagrin that this was a violation of his religious beliefs, and C.O. Alagrin cursed at plaintiff and ordered him back to his cell.  Id.  C.O. Alagrin told plaintiff, "this is what you get for not dropping those grievances," and threatened to "smash [plaintiff's] face into the wall."  Id.  He also stated that if plaintiff wrote another grievance, he would "make sure that [plaintiff] pays."  Id.

On December 3, 2013, three corrections officers ordered plaintiff to attend an interview regarding a grievance he had filed.  Am. Compl. ¶ 25.  C.O. Blyth pat-frisked plaintiff, and when he began to search his hair, plaintiff informed him that this was a violation of his religious beliefs.  Id.  C.O. Blyth continued to search plaintiff's hair in a "rough aggressive manner," and ripped out a portion of plaintiff's hair.  Id.  C.O. Blyth then "berate[d]" plaintiff for the grievances he filed against Sgt. Keane and other staff members.  Id.  Plaintiff told Sgt. Lelleck that corrections staff had violated his religious rights, and Sgt. Lelleck informed him that his rights would not be violated if he stopped writing grievances.  Id.  Plaintiff told Sgt. Lelleck on numerous occasions that corrections staff violated his constitutional rights, and he took no action.  Id.

On February 10, 2014, Sgt. Lelleck selected plaintiff for a random search, and instructed C.O. Zibler to frisk him.  Id. ¶ 29.  C.O. Zibler pat-frisked plaintiff and "ran his hands up [plaintiff's] legs and grabbed [his] penis and testicles."  Id.  C.O. Zibler "wedged [plaintiff's pants between [his] buttocks cheeks" and "press[ed] on [his] anal hole" while whispering expletives.  Id.  Plaintiff sought medical treatment for pain

resulting from the pat frisk.  Id.  On August 2, 2014, C.O. Hoffman pat-frisked plaintiff and searched his hair in a "rough manner."  Id. ¶ 33.  Plaintiff informed C.O. Hoffman that this violated his religious beliefs, and C.O. Hoffman responded that "he will do what he wanted to do."  Id.  When plaintiff returned to his cell later that day, C.O. Hoffman searched plaintiff's hair in a "rough aggressive manner" and "squeezed" plaintiff's genitals.  Id.  C.O. Phillips and C.O. Oliveria watched C.O. Hoffman, but did not intervene.  Id. ¶ 34. Plaintiff sought medical treatment for testicle swelling and pain.  Id. ¶ 33.  C.O. Phillips and C.O. Hoffman later told plaintiff that the incident would not have occurred had plaintiff not filed a grievance against C.O. Zigler.  Id. ¶ 34.  Plaintiff informed Supt. Smith by written and verbal communication regarding Sgt. Keane, Sgt. Lelleck, and Sgt. Deacon's conduct, no action was taken.  Id. ¶ 35.

### 5. Eighth Amendment Conditions of Confinement

On October 26, 2013, C.O. Lange informed plaintiff that Sgt. Keane expected him to drop his pending grievances or he would be continued in keeplock.  Am. Compl. ¶ 20.  Plaintiff stated that he would not drop his grievances, and C.O. Lange said that plaintiff would regret his decision.  Id.  On November 2, 2013, C.O. Lange denied plaintiff recreation, and stated that he would continue to be denied recreation and showers if he kept complaining.  Id.  C.O. Lange told plaintiff that if he complained about the denial of recreation, he would issue plaintiff a misbehavior report and ensure that the hearing officer would find him guilty to "teach [him] a lesson."  Id.  The next day, C.O. Lange issued plaintiff a misbehavior report.  Id.  On November 4, 2013, Lt. Gardner commenced a disciplinary hearing and found plaintiff guilty, sentencing him to an unspecified time in keeplock, and loss of packages, commissary, phones, and events.  Id.  C.O. Lange denied plaintiff recreation on five other occasions, and showers and the privilege to attend the barbershop on one occasion each.  Id. ¶¶ 21, 22.

7

### 6. Eighth Amendment Deliberate Indifference

On plaintiff's arrival at Shawangunk on July 29, 2013, he received a permit for his walking cane, right ACL knee brace, and wheelchair. Am. Compl. ¶ 10. The permits had an expiration date of August 24, 2013. Id.[3] Plaintiff informed Dr. Lee that his permits expired, and requested their renewal. Id. ¶ 43. On August 29, 2013 and September 1, 2013, non-party officers ordered plaintiff to visit the clinic to receive his urology medication. Id. ¶¶ 11, 12, 43. On each occasion, plaintiff informed the officer that he needed his cane and knee brace, and the officers informed him that the permit had expired. Id. ¶¶ 11, 12. Plaintiff refused to attend the clinic, and both officers berated plaintiff for filing grievances against fellow officers. Id. The non-party officers issued plaintiff two misbehavior reports, dated August 30, 2013 and September 2, 2013. Id. On September 8, 2013, plaintiff again received a misbehavior report after he refused to attend the clinic without his ambulatory devices. Id. ¶ 13. Dr. Lee did not renew plaintiff's medical permits until the end of September 2013. Id. ¶ 43.

On September 12, 2013, Dr. Lee discontinued plaintiff's urology medication. Am. Compl. ¶ 45. Plaintiff requested that Dr. Lee renew his medication, and Dr. Lee denied or ignored those requests. Id. Plaintiff wrote Dr. Lee regarding lower back and knee pain, lower left leg numbness, pain and swelling, and frequent night urination. Id. Dr. Lee ignored plaintiff's correspondence, and did not provide plaintiff treatment. Id. On January 29, 2014, plaintiff met with Dr. Lee and requested a permit for "no stairs"; "medical feed"; and treatment for his chronic pain, numbness, and frequent urination. Id. Dr. Lee told plaintiff "in an aggressive tone" to "shut up," and stated that he would not listen to him because of prior grievances plaintiff filed against him. Id. Dr. Lee then ordered plaintiff to leave his office. Id. Sometime later, plaintiff requested a permit to stand during his programs because of his inability to sit for long periods. Id. Dr. Lee denied the request, and told plaintiff that "he [did] not like [plaintiff] because [he] wrote

---

[3] In a later paragraph, plaintiff contends that these permits expired on August 21, 2013. Am. Compl. ¶ 43.

grievances against him and the medical staff." Id. Dr. Lee also denied plaintiff's request for an MRI. Id.

Plaintiff alerted Dr. Lee and the medical staff that his permit for tinted eyeglasses expired on March 4, 2014. Am. Compl. ¶ 46. On March 18, 2014, plaintiff met with Dr. Lee and requested that his tinted eyeglass permit be renewed. Id. Dr. Lee stated that he would renew the permit, but plaintiff did not receive the eyeglasses until after April 8, 2014. Id. Without his tinted eyeglasses, plaintiff experienced eye pain and discomfort; double, blurry vision; migraine headaches; and elevated eye pressure as due to his glaucoma. Id. On May 9, 2014, Dr. Lee denied an eye specialist's recommendation for a darker tint in plaintiff's glasses. Id.

Plaintiff informed Dr. Lee that his knee brace and cane permits expired on March 17, 2014, but Dr. Lee did not renew the permit until April 10, 2014. Am. Compl. ¶ 46. Plaintiff "constantly f[e]ll" without his knee brace and cane, which caused "great pain and discomfort, [and] severe swelling." Id. In June 2014, Dr. Lee denied plaintiff's request for a permit to cover his cell bars with a sheet to accommodate his "shy bladder" syndrome. Id. ¶ 47. A nurse informed plaintiff that Lt. Palen stated that he could cover himself with a sheet, and plaintiff's request was denied. Id. Plaintiff wrote and verbally communicated with Dr. Lee about a permit to cover his cell bars, but Dr. Lee denied plaintiff's request. Id. As a result, plaintiff frequently soiled himself at night. Id.

At an unspecified time, plaintiff informed Dr. Lee that his cell was not properly ventilated, which aggravated his asthma. Am. Compl. ¶ 48. Dr. Lee did nothing to treat plaintiff's symptoms. Id. Plaintiff also told Dr. Lee of right knee and shoulder pain, lower back pain, back spasms, and left leg swelling and numbness, but Dr. Lee failed to provide treatment, despite a recommendation from plaintiff's orthopaedic specialist that plaintiff's chronic pain be treated. Id.

On June 28, 2014, plaintiff requested emergency sick call, and C.O. Zibler denied his request for medical attention. Am. Compl. ¶ 31.

### 7. Fourteenth Amendment Due Process

In September 2013, Lt. Gardner prevented plaintiff from attending two disciplinary hearings. Am. Compl. ¶¶ 11, 12. Lt. Gardner, the hearing officer, found plaintiff guilty of unspecified conduct at the September 4, 2013 disciplinary hearing, and sentenced him to fifteen days keeplock and thirty days loss of packages, phones, commissary, and events. Id. At the September 5, 2013 disciplinary hearing, Lt. Gardner found plaintiff guilty and sentenced him to twenty-one days keeplock and thirty days loss of packages, commissary, phones, and events. Id.

Plaintiff was not allowed to attend a September 12, 2013 disciplinary hearing. At this hearing, Lt. Gardner found him guilty, and sentenced him to thirty days of keeplock, and thirty days loss of commissary, phones, packages, and events. Am. Compl. ¶ 13. On November 27, 2013, Lt. Palen commenced a disciplinary hearing, and, after C.O. Zibler threatened plaintiff with bodily harm, plaintiff was not permitted to return to the hearing. Id. ¶ 24. Prior to plaintiff leaving the hearing room, Lt. Palen informed plaintiff that he knew of plaintiff's grievances, and that they would be found unsubstantiated by the grievance committee. Id. Lt. Palen later found plaintiff guilty of unspecified conduct, and sentenced him to thirty days of keeplock and loss of packages, commissary, phones, and television. Id.

Lt. Gardner informed plaintiff off-the-record at an unspecified disciplinary hearing that if plaintiff ceased filing grievances, the Shawangunk staff would "stop fucking with [him], and confining [him]." Am. Compl. ¶ 51. Lt. Gardner and Lt. Palen kept plaintiff confined to his cell for approximately 147 days, where he was unable to attend therapeutic programs, receive packages, attend recreation and religious classes, access the law library, or attend other family and religious events. Id. ¶ 52. Lt. Gardner and Lt. Palen also denied plaintiff telephone calls. Id.

### B. Defendants' Recitation of the Facts

### 1. First Amendment Free Exercise

On December 3, 2013, DSP Andrews submitted a statement as part of an investigative report in response to plaintiff's grievance (SHG-28649-13) which stated that, pursuant to DOCCS Directive 4202, "[t]he Rastafarian faith group has room B1200 reserved on every Tuesday evening from 6 p.m. to 8:40 p.m. The inmate facilitator has been approved to conduct classes & services, at his discretion." Dkt. No. 107-1 ¶¶ 5,6. On December 19, 2013, Supt. Smith submitted a memorandum in response to plaintiff's grievance (SHG-28649-13) in which he advised plaintiff that "[t]he Rastafarian group has a room reserved every Tuesday from 6:00 p.m. - 8:40 p.m. the inmate religious facilitator has been approved to conduct classes. Currently there is no DOCCS or outside chaplain." Id. ¶ 28. Supt. Smith was unaware that plaintiff requested special dietary considerations, and plaintiff did not request special dietary considerations from him personally. Id. ¶ 29. Pursuant to Directive 4202, "an alternative nutritionally adequate diet can be provided [to an inmate] after validation and verification of religious need has been made by either the Ministerial Program Coordinator of the faith group or the Director of Ministerial and Family Services, and also approved by the Assistant Commissioner for Health Services." Dkt. No. 107-1 ¶ 8. A newly-admitted or in-transit inmate may request a CAD diet, and will receive such meals until a staff member can verify and approve the diet. Id. Plaintiff failed to request special dietary restrictions on his admission to Shawangunk. Id. ¶ 10.

Plaintiff did not request special dietary considerations from Mr. Rapp during his incarceration at Shawangunk. Dkt. No. 107-1 ¶ 220. Mr. Rapp does not have the authority to approve or deny CAD applications, but he is required to ensure that CAD is available for inmates approved for, or in the process of obtaining approval for CAD. Id. Mr. Rapp never received information from a religious coordinator or the health services Assistant Commissioner indicating that plaintiff was approved for special dietary

11

restrictions.  Id. ¶ 270.

## 2. First Amendment Retaliation

Sgt. Keane denies threatening, harassing, or calling plaintiff derogatory names.  Dkt. No. 107-1 ¶ 94.  In October 2013, plaintiff complained that he was denied toilet paper.  Id. ¶ 95.  In response to that complaint, Sgt. Keane ordered C.O. Alagrin to do a visual check of plaintiff's cell to determine the number of rolls of toilet paper in his cell.  Id. ¶¶ 94, 330.  Nothing was taken from plaintiff's cell during the visual check.  Id. ¶ 94.  Sgt. Keane did not order C.O. Alagrin to search plaintiff's cell.  Id. ¶ 97.  A visual inspection does not require documentation with a contraband receipt, and, therefore, C.O. Alagrin did not issue plaintiff a receipt.  Id. ¶¶ 97, 332.

On November 5, 2013, C.O. Morgenthaler did not harass or threaten plaintiff, or kick his cell bars.  Dkt. No. 107-1 ¶ 282.  On November 22, 2013, C.O. Morgenthaler did not threaten or harass plaintiff.  Id. ¶ 279.  On December 3, 2013, C.O. Blyth did not make abusive or harassing comments to plaintiff.  Id.

Prior to April 2014, an unnamed source informed Lt. Gardner that plaintiff was under the influence of drugs.  Dkt. No. 107-1 ¶ 50.  In accordance with Directive 4937, Lt. Gardner subsequently requested and authorized urinalysis testing to determine whether plaintiff had drugs in his system.  Id. ¶¶ 50, 52.  On June 20, 2014, C.O. Morgenthaler issued plaintiff a misbehavior report charging him with refusing a direct order (112.22) and cell obstruction (112.22).  Dkt. No. 107-1 ¶¶ 71, 284.

If Sgt. Lelleck directed that plaintiff be searched on February 10, 2014 on his return from afternoon programs, he would have done so for the safety and the security of the facility, as he never ordered a random search as retaliation.  Dkt. No. 107-1 ¶ 104.

12

### 3. First Amendment Access to the Courts

To access the law library, a keeplocked inmate must submit a written call out request to be added to the law library call out list.  Dkt. No. 107-1 ¶ 142.  A corrections officer allows the first twenty-five inmates who have requested such access into the law library.  Id.  Although law library call outs are mandatory, an inmate may decline to attend the visit.  Id.  If an inmate requests special access to the law library, he or she must provide proof of an upcoming court deadline to the Law Library Administrator.  Id.  Then, the inmate's name is added to the special access log book, or "deadline book," which is maintained at the law library.  Id.  In January and/or February 2014, plaintiff requested access to a notary, but did not mention a pending court deadline or a need to access the law library.  Id. ¶¶ 141, 143.  If plaintiff had requested access pursuant to a court deadline, his name would have been written in the deadline book; plaintiff's name was not listed.  Id. ¶ 143.  Plaintiff received a notary on February 5, 2014 and February 20, 2014.  Id.

C.O. Marasco did not destroy plaintiff's legal documents or photographs.  Dkt. No. 107-1 ¶ 175.  If C.O. Marasco undertook a search of plaintiff's cell, it would have been in accordance with Directive 4910, and, if it were a random search, it would have been completed at the direction of the Deputy Superintendent for Security.  Id. ¶ 177.  All scheduled cell searches are conducted at the direction of a sergeant or higher-ranking officer, and are documented in a log book maintained by the officer in charge of the inmate's housing unit.  Id. ¶ 178.  Pursuant to the C-1 cell log book, C.O. Marasco conducted a random cell search of plaintiff's cell on May 2, 2014.  Id. ¶ 179.  The Deputy Superintendent for Security ordered the May 2, 2014 search, and no contraband was found.  Id.  Plaintiff's cell was not damaged.  Id.

C.O. Heister did not handle law library request slips, and, thus, never denied plaintiff access to the law library.  Dkt. No. 107-1 ¶¶ 210, 212.

**4. Eighth Amendment Sexual Assault and Excessive Force**

C.O. Strang denies sexually assaulting plaintiff on September 24, 2013, and maintains that he conducted the pat frisk pursuant to Directive 4910. Dkt. No. 107-1 ¶¶ 127, 130. Plaintiff refused to submit to a medical examination in connection with his sexual assault complaint, and refused an interview with the Office of Mental Health on an unspecified date. Id. ¶ 126.

On October 25, 2013, C.O. Alagrin assisted an unnamed officer in pat-frisking plaintiff prior to recreation. Dkt. No. 107-1 ¶ 331. C.O. Alagrin did not pull, grab, tear, or forcefully search plaintiff's hair. Id. On November 9, 2013, C.O. Alagrin attempted to frisk plaintiff, but plaintiff "had flipped all of his hair to his front right side of his body which covered the front of his sweatshirt." Id. ¶ 333. C.O. Alagrin's right hand touched plaintiff's hair as he was checking the front pockets of plaintiff's sweatshirt. Id. C.O. Alagrin did not pull or search plaintiff's hair, nor did he threaten plaintiff. Id. On December 3, 2013, C.O. Blyth pat-frisked plaintiff prior to leaving his housing block, which is standard procedure for a keeplocked inmate. Id. ¶ 198. C.O. Blyth completed the pat frisk without incident, and escorted plaintiff to the tier office for an interview. Id.

On February 10, 2014, C.O. Zibler conducted a pat frisk of plaintiff. Dkt. No. 107-1 ¶ 187. C.O. Zibler did not grab or squeeze plaintiff's genitals, nor did he "run his hands between plaintiff's buttocks or anus." Id.

On August 2, 2014, C.O. Hoffman conducted routine pat frisks of plaintiff. Dkt. No. 107-1 ¶ 152. C.O. Hoffman did not search plaintiff's hair, nor did he rip and/or tear any portion of plaintiff's hair. Id. ¶ 153. C.O. Hoffman did not use excessive force or sexually assault plaintiff. Id. ¶ 154. C.O. Phillips has a duty to report complaints of sexual abuse to his superiors in accordance with DOCCS policy, and maintains that if he had witnessed, or been informed of, any such abuse directed at plaintiff, he would have intervened and reported it to his supervisors. Id. ¶¶ 163, 164, 168.

14

**5. Eighth Amendment Conditions of Confinement**

Keeplocked inmates are offered shower call outs and/or recreation on Monday, Wednesday, and Friday. Dkt. No. 107-1 ¶¶ 133. Inmates may choose to attend, or they may refuse. Id. A daily attendance log is kept for each activity. Id. C.O. Lange did not deny plaintiff recreation, showers, or the barber shop; instead, plaintiff refused showers and recreation. Id. ¶¶ 134, 135. On November 12, 2013, C.O. Alagrin did not interact with plaintiff, and did not deny him recreation; plaintiff refused to attend recreation. Id. ¶ 334. On June 28, 2014, C.O. Zibler did not deny plaintiff recreation. Id. ¶ 191.

**6. Eighth Amendment Deliberate Indifference**

Sick call is available at least five days per week, and scheduled sick call is available at least four days per week. Dkt. No. 107-1 ¶ 213. An inmate may request sick call by completing a sick call request slip. Id. Sick call request slips are collected on a daily basis and placed in a designated container where they are later reviewed by the medical staff. Id. The medical staff sorts the sick call requests and schedules appointments based on priority and the availability of the particular medical provider. Id. C.O. Heister was not present at Shawangunk on September 4, 2013, and, therefore, could not have denied plaintiff access to sick call on that particular date. Id. ¶ 209. At all other times, C.O. Heister followed Directive 4933 when placing sick call requests in their designated location. Id. ¶ 214.

Dr. Lee, a physician, was plaintiff's primary care provider while plaintiff was incarcerated at Shawangunk. Dkt. No. 107-1 ¶ 290. On July 31, 2013, eight days after his arrival at Shawangunk, medical staff issued plaintiff a permit for a cane, knee brace, and wheelchair for long distance. Id. ¶ 293. The permit expired on August 21, 2013. Id. Plaintiff did not renew the permit prior to the expiration date, nor did he request a temporary permit from the nurse. Id. ¶ 294. On August 21, 2013, Dr. Lee advised plaintiff to request an appointment prior to September 19, 2013 so that he could reevaluate plaintiff's need for the three

items. Id. ¶ 295. On August 29, 2013 and September 1, 2013, plaintiff refused to leave his cell to pick up his medications. Id. ¶ 296. On September 9, 2013, a nurse recorded that plaintiff "continues to refuse to come to medical states now he wants his [wheelchair] . . . he has been walking to medical when he comes for meds & now his permit expired on August 21, [20]13." Id. On September 10, 2013, Dr. Lee evaluated plaintiff, and determined that he did not need a wheelchair for ambulation. Id. ¶ 297. However, he reissued plaintiff's permit for a cane and a knee brace from September 17, 2013 through March 17, 2014. Id. ¶ 298. On March 18, 2014, Dr. Lee reissued the cane and knee brace permit through September 18, 2014. Id. On April 4, 2014, after plaintiff complained that his new permit had not been signed, a nurse issued him a three-day permit pending clearance of a long-term permit. Id. ¶ 312. On April 10, 2014, plaintiff received a one-year permit for his knee brace and cane. Id. ¶ 310.

On September 12, 2013, Dr. Lee discontinued plaintiff's urology medication because he refused this medication on multiple occasions: (1) on August 13, 2013, plaintiff refused to allow a nurse to take his vital signs before providing medication; (2) on August 29, 2013, plaintiff refused to leave his cell for his 9:00 P.M. medication, and informed the corrections officer that he was not taking his medication; (3) on September 1, 2013, plaintiff again refused to leave his cell for 9:00 P.M. medication, and stated that he did not want his medication; (4) on September 5, 2013, plaintiff refused to leave his cell, and stated that he did not want his medication; and (5) on September 10, 2013, plaintiff refused his medication, and stated that he did not want it. Id. ¶ 302. On September 17, 2013, plaintiff complained of frequent nighttime urination, and Dr. Lee reordered plaintiff's prescription. Id. ¶ 303. On September 20, 2013, plaintiff refused to come for his medication. Id.

In September 2013, plaintiff was referred to physical therapy for his lower back pain, which he completed in October 2013. Dkt. No. 107-1 ¶ 307. Plaintiff's medical records do not indicate that a physical therapist recommended an MRI of plaintiff's shoulder. Id. Plaintiff continued to complain of lower back

pain, and Dr. Lee recommended that plaintiff undergo an MRI of his lumbar spine. Id. ¶ 321. Based on the MRI results, Dr. Lee referred plaintiff for an orthopedic consultation to occur on April 25, 2014, with a follow-up appointment on June 27, 2014. Id. ¶ 322. The specialist recommended a lumbarsacral corset, and the continued use of a cane and analgesics. Id. Plaintiff was measured, and received the corset on June 25, 2014. Id. ¶ 323.

On September 4, 2013, plaintiff received a six-month permit for tinted eyeglasses. Id. ¶ 314. There is no indication that plaintiff requested a renewal before the permit's expiration. Id. On March 21, 2014, plaintiff requested a renewal of his tinted eyeglasses permit. Id. A nurse issued a three-day permit, and on April 8, 2014, plaintiff received a one-year permit. Id. On or about May 2, 2014, plaintiff visited the ophthalmology clinic at Coxsackie Correctional Facility. Id. ¶ 315. Three days later, plaintiff met with Dr. Lee, who referred him to an optometrist for darker-tinted eyeglasses. Id. On May 9, 2014, a nurse confirmed that plaintiff had seen the optometrist, and that new, darker-tinted glasses were ordered. Id.

On June 9, 2014, plaintiff attended an Asthma Interim Visit, where he complained of frequent wheezing due to the weather, dust, and pollen. Dkt. No. 107-1 ¶ 316. Dr. Lee noted that plaintiff suffered from mild intermittent asthma and that the condition was stable. Id. Dr. Lee advised plaintiff to use his inhaler as needed. Id.

### 7. Fourteenth Amendment Due Process

Lt. Gardner conducted six of plaintiff's disciplinary hearings occurring on September 4, 2013; September 12, 2013; September 12, 2013; November 4, 2013; January 10, 2014; and June 30, 2014. Dkt. No. 107-1 ¶ 46. Plaintiff refused to attend a majority of these disciplinary hearings, and Lt. Gardner commenced them in absentia. Id. Prior to each of the abovementioned hearings, plaintiff received advanced notice and a copy of the misbehavior reports. Id. ¶ 47. Plaintiff had the opportunity to call witnesses at the

hearings and present evidence on his behalf.  Id. ¶ 48.  At the conclusion of each hearing, plaintiff received a written disposition and an appeal form.  Id.

On November 27, 2013, Lt. Palen commenced a Tier II Disciplinary Hearing pursuant to a misbehavior report charging plaintiff with threats (102.10), creating a disturbance (104.13), and correspondence (180.11).  Dkt. No. 107-1 ¶¶ 58, 59.  Plaintiff received a copy of the misbehavior report four days before the hearing.  Id. ¶ 60.  Plaintiff attended the first portion of the hearing, and his not guilty plea was recorded in the record.  Id. ¶ 63.  Plaintiff waived his right to attend the remainder of the hearing after an adjournment on November 27, 2013.  Id. ¶ 64.  Lt. Palen found plaintiff guilty of threats, and sentenced him to thirty days keeplock and thirty days loss of packages, commissary, phones, and television.  Id. ¶¶ 65, 66.  Lt. Palen provided plaintiff with a written disposition and an appeal form.  Id. ¶¶ 67, 69.

On June 25, 2014, Lt. Palen commenced a Tier II misbehavior hearing regarding C.O. Morgenthaler's June 20, 2014 misbehavior report.  Dkt. No. 107-1 ¶¶ 71, 72.  Plaintiff received a copy of the misbehavior report four days before the hearing.  Id. ¶ 75.  Plaintiff attended the first portion of the hearing, and his not guilty plea was recorded in the record.  Id. ¶ 74.  Plaintiff waived his right to attend the remainder of the hearing.  Id. ¶ 76.  Lt. Palen found plaintiff guilty of refusing a direct order and cell visibility obstruction, and sentenced him to thirty days keeplock and thirty days loss of packages, commissary, and phones.  Id. ¶ 79.  Lt. Palen provided plaintiff with a written disposition and an appeal form. Id. ¶ 82.

## II. Discussion[4]

### A. Legal Standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to

---

[4] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. Id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally," . . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . . At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings

by <u>pro se</u> litigants," . . . and that <u>pro se</u> status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

<u>Id.</u> (citations and footnote omitted); <u>see also</u> <u>Sealed Plaintiff v. Sealed Defendant</u>, 537 F.3d 185, 191-92 (2d Cir. 2008).

### B. Exhaustion

Defendants argue that plaintiff failed to exhaust his administrative remedies as to his claims against Supt. Smith, DSP Andrews, Lt. Palen, Sgt. Keane (as to the alleged October 7, 2013 incident), Sgt. Lelleck, Sgt. Deacon, C.O. Heister, C.O. Lange, C.O. Marasco, C.O. Hoffman, C.O. Phillips, and Mr. Rapp. Dkt. No. 107-2 ("Def. Mem. of Law") at 26-27. Plaintiff contends that he "exhausted his administrative remedies when he filed his grievances and/or complaints and appealed those grievances that the defendants filed and processed." Dkt. No. 113-1 ("Pl. Opp.") at 25.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See <u>Porter v. Nussle</u>, 534 U.S. 516, 524 (2002); <u>see also</u> <u>Woodford v. Ngo</u>, 548 U.S. 81, 82 (2006). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." <u>Porter</u>, 534 U.S. at 532. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. <u>Id.</u> at 524. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See <u>Jones v. Bock</u>, 549 U.S. 199, 218 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized

20

that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, __ U.S. __,136 S. Ct. 1850, 1862 (2016). Thus, the "special circumstances" exception in Hemphill v. New York, 680 F.3d 680, 686 (2d Cir. 2004) is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).[5]

Although Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

### 1. Did Plaintiff Exhaust his Administrative Remedies?[6]

---

[5] In Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception. See Williams, 829 F.3d at 123. The Williams Court stated that "Ross largely supplants our Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." Id. (citing Ross, 136 S. Ct. at 1858-59).

[6] First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt

Defendants appear not to dispute that plaintiff grieved the underlying claims in his complaint; rather, defendants argue that plaintiff failed to specifically grieve particular defendants in relation to those claims. See Def. Mem. of Law at 26-27. Defendants proffer the declarations of non-party Shawangunk Inmate Grievance Program Supervisor ("IGPS") Michael Cunningham and non-party Inmate Grievance Program Assistant Director Rachel Seguin, who each declared that DOCCS records demonstrate that plaintiff failed to grieve: (1) supervisory liability, First Amendment access to the courts and free exercise, and Fourteenth Amendment equal protection claims against Supt. Smith; (2) First Amendment access to the courts and Eighth Amendment medical indifference claims against C.O. Heister; (3) First Amendment retaliation and Fourteenth Amendment due process claims against Lt. Palen; (4) First Amendment retaliation and Eighth Amendment conditions of confinement claims against C.O. Lange; (5) First Amendment retaliation claims against Sgt. Lelleck; (6) First Amendment free exercise claims against Mr. Rapp; (7) First Amendment retaliation and access to the courts claims against C.O. Marasco; (8) First Amendment retaliation claims against Sgt. Deacon; (9) First Amendment free exercise and retaliation, and Eighth Amendment excessive force and sexual assault claims against C.O. Hoffman; (10) First Amendment retaliation and Eighth Amendment failure to intervene claims against C.O. Phillips; (11) First Amendment free exercise and access to the courts, and Fourteenth Amendment equal protection claims against DSP Andrews; and (12) First Amendment retaliation and access to the courts claims against Sgt. Keane. Dkt. No. 109-9 ("Cunningham Decl.") ¶¶ 7-18; Dkt. No. 109-3 ("Seguin Decl.") ¶¶ 8-19, 23. In response, plaintiff offers copies of various grievances he filed in connection with this lawsuit. Dkt. No. 113-7 at 56-114.

In New York State, the IGP regulations do not require that an inmate's grievance contain the name

---

of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii). Parties do not dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5.

of the offending corrections officer.  See Espinal v. Goord, 558 F.3d 119, 126 (2d Cir. 2009).  "[T]he IGP regulations offer the general guidance that a grievance should 'contain a concise, specific description of the problem,' . . . and the complaint form does not instruct the inmate to name the officials allegedly responsible for misconduct."  Id. (internal citations omitted).  Therefore, an inmate "is not required to name responsible parties in a grievance in order to exhaust his administrative remedies."  Id.  However, PLRA's exhaustion requirement is "not dissimilar to the rules of notice pleading."  Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004).  It requires that prison officials be afforded the time and opportunity to address a complaint internally; thus, "[i]n order to exhaust   . . . inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures."  Id.

### a. Free Exercise Claims:
### Supt. Smith, DSP Andrews, C.O. Hoffman, and Mr. Rapp

Plaintiff claims to have filed four grievances in relation to his free exercise claims.[7]  Dkt. No. 113-7 at 56.  In grievance SHG-28652-13, plaintiff alleges that prior to his transfer to Shawangunk, he was approved for the cold alternative diet due to his religious beliefs.  Id.  Plaintiff contends that when he entered Shawangunk on July 29, 2013,  he "made the Food Administrator aware of his approved religious meal via numerous letters."  Id.  He also states that "the Food Administrator ignor[ed] [his] request for religious meals[,] as well as the Deputy Superintendent of Programs," and that his "religious rights are being violated."  Id.  In grievance SHG-28649-13, plaintiff contends that Shawangunk failed to provide him Rastafarian religious services, which amounts to religious discrimination.  Id. at 57-58.  Grievance SHG-28649-13 does not reference any particular staff member with regard to plaintiff's alleged denial of CAD or religious services.  Id.

With respect to grievance SHG-28652-13 concerning CAD,  it is clear that plaintiff does not mention

---

[7] Plaintiff only provides two of the alleged four grievances.  See Dkt. No. 113-7 at 56-58.

Supt. Smith or C.O. Hoffman by name, nor does he allude to either officer by title or rank.  See Dkt. No. 113-7 at 56-58.  Moreover, the Superintendent's decision does not mention that plaintiff communicated, either verbally or written, with Supt. Smith or C.O. Hoffman as to CAD.  See id. at 59.  Thus, there is nothing in plaintiff's grievances that would alert prison officials to investigate a subsequent free exercise claim against Supt. Smith and C.O. Hoffman, and such claim was not properly grieved.  See Luckerson v. Goord, No. 00 Civ. 9508(JSR), 2002 WL 1628550, at *2 (S.D.N.Y. July 22, 2002) ("For [the defendants] now to have to litigate a federal lawsuit premised on allegations that . . . they had no reason to address [in the IGRC] would make a mockery of the exhaustion requirement.").  Moreover, to the extent that plaintiff sent Supt. Smith letters regarding CAD, it is well-established in the Second Circuit that any informal resolution or relief outside of the administrative procedures does not satisfy exhaustion requirements.  See, e.g., Macias v. Zenk, 495 F.3d 37, 43 (2d Cir. 2007); Day v. Chaplin, 354 F. App'x 472, 474 (2d Cir. 2009) (summary order) (noting that informal letters sent to prison officials "do not conform to the proper administrative remedy procedures.").  Thus, because these letters were sent to officials outside the grievance chain of command, they do not satisfy the exhaustion requirement.

Insofar as plaintiff proffers a grievance complaint dated August 2, 2014 as evidence of C.O. Hoffman's violation of his free exercise of religion, there is no indication that the Shawangunk IGRC ever received this grievance, as there is no stamp on the grievance indicating that it had been received.  See Veloz v. New York, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) (concluding that the plaintiff "failed to make reasonable attempts to fully exhaust his available administrative remedies" where "there is no evidence whatsoever that any of these grievances were filed with a grievance clerk: the signature of a grievance officer is not on any of the forms and there is no indication in the record that the grievance officer received any of the forms.").  Ms. Seguin declares that plaintiff never appealed a grievance alleging First Amendment free exercise claim against C.O. Hoffman to CORC.  See Seguin Decl. ¶¶ 16, 24, 25.  Moreover, even if plaintiff

did submit this grievance, plaintiff has not proffered evidence demonstrating that he appealed the grievance to the next administrative level, nor does he allege that the grievance process was unavailable to him. See Veloz, 339 F. Supp. 2d at 516. Therefore, because plaintiff failed to exhaust his administrative remedies as to his First Amendment free exercise claims against Supt. Smith and C.O. Hoffman, it is recommended that defendants' motion on this ground be granted.

As to DSP Andrews and Mr. Rapp, although plaintiff does not formally state their names in grievance SHG-28652-13, he references both defendants by title, stating that he made both the Shawangunk Food Administrator and the Deputy Superintendent of Programs aware as to his need for CAD pursuant to his Rastafarian beliefs. Dkt. No. 113-7 at 56. As DSP Andrews and Mr. Rapp attest that they held the positions of Deputy Superintendent of Programs and Food Administrator, respectively, the undersigned finds that, on its face, grievance SHG-28652-13 provided investigators significant information to investigate plaintiff's claim that he requested and was wrongly denied CAD. Therefore, the undersigned finds that, on its face, grievance SHG-28652-13 provided investigators significant information to investigate plaintiff's claim that he was denied Rastafarian religious services, and it is recommended that defendants' motion on this ground be denied. See Casey v. Brockley, No. 9:13-CV-01271 (DNH/TWD), 2018 WL 1399244, at *10 (N.D.N.Y. Feb. 18, 2018).

With respect to grievance SHG-28649-13 concerning the lack of Rastafarian programs, Supt. Smith and DSP Andrews assisted in the investigation of the grievance, and provided investigative reports confirming that although there was no DOCCS or outside chaplain, the Rastafarian faith group met for weekly classes. See Dkt. No. 109-1 ("Andrews Decl.") at 5; Dkt. No. 109-20 ("Smith Decl.") at 7. Thus, although plaintiff does not specifically name Supt. Smith or DSP Andrews in grievance SHG-28649-13, plaintiff provided enough information for defendants to investigate his claim and seek clarification from both the Superintendent and the Deputy Superintendent of Programs. See id.; see also Casey, 2018 WL 1399244,

25

at *10 ("Thus, . . . the Deputy Superintendent's report investigating plaintiff's claim of deliberate indifference shows that [p]laintiff's grievance had provided [d]efendants sufficient information to investigate [p]laintiff's deliberate indifference to medical needs claims."). Therefore, as DOCCS records indicate that plaintiff fully exhausted grievance SHG-28649-13, it is recommended that defendants' motion on this ground be denied.

### b. Access to the Courts:
### Supt. Smith, DSP Andrews, Sgt. Keane, C.O. Heister, and C.O. Marasco

Plaintiff submitted at least four grievances concerning his access to the law library and the distribution of legal materials. See Dkt. No. 113-7 at 60-64. However, grievances SHG-28430-13, SHG-28452-13, SHG-28827-14, and SHG-28892-14 fail to give adequate notice of plaintiff's access to the courts claim against Supt. Smith, DSP Andrews, Sgt. Keane, C.O. Heister, or C.O. Marasco. Although plaintiff details the underlying facts of his claims in the grievances, plaintiff does not mention Supt. Smith, DSP Andrews, Sgt. Keane, C.O. Heister, or C.O. Marasco as parties who violated his constitutional rights. See id.[8] Neither party has offered a Superintendent's decision or the CORC decision demonstrating whether Supt. Smith, DSP Andrews, Sgt. Keane, C.O. Heister, or C.O. Marasco were interviewed with regard to the claim, and, therefore, establishing their knowledge of the pending grievance. See Casey, 2018 WL 1399244, at *10. There is nothing in plaintiff's grievances that would alert prison officials to investigate a subsequent denial of access to the courts by Supt. Smith, DSP Andrews, Sgt. Keane, C.O. Heister, or C.O. Marasco; thus, such claim was not properly grieved. See Turner v. Goord, 376 F. Supp. 2d 321, 324 (W.D.N.Y. 2005) ("[T]he mere fact that plaintiff filed some grievance, and fully appealed all the decisions on that grievance, does not automatically mean that he can now sue anyone who was in any way connected with the events

---

[8] Plaintiff does specifically name C.O. Pearson in at least one grievance, and defendants do not challenge exhaustion against him. See Dkt. No. 113-7 at 63-64.

giving rise to that grievance.").

However, in grievance SHG-28625-13, plaintiff alleges that C.O. Alagrin retaliated against him by confiscating his legal documents. Dkt. No. 113-7 at 65. In the course of investigating plaintiff's retaliation claim, Sgt. Keane submitted a memorandum regarding his involvement in the cell search that led to the alleged confiscation of documents. See Dkt. No. 109-10 ("Keane Decl.") at 8. Sgt. Keane is referenced in the January 15, 2014 Superintendent's decision and the July 9, 2014 CORC decision. Id. at 12, 16. Thus, it is clear that plaintiff proffered enough information in grievance SHG-28625-13 to allow the Shawangunk IGRC to investigate Sgt. Keane's involvement in the confiscation of plaintiff's legal materials, and seek clarification from Sgt. Keane. See Casey, 2018 WL 1399244, at *10. Thus, as DOCCS records indicate that plaintiff fully exhausted grievance SHG-28625-13, it is recommended that defendants' motion as to Sgt. Keane be denied. However, because plaintiff failed to exhaust his administrative remedies as to his First Amendment access to the court claims against Supt. Smith, DSP Andrews, C.O. Heister, or C.O. Marasco, it is recommended that defendants' motion on this ground be granted.

### c. Retaliation:
### Lt. Palen, Sgt. Lelleck, Sgt. Deacon, Sgt. Keane, C.O. Lange
### C.O. Marasco, C.O. Hoffman, and C.O. Phillips

Plaintiff filed at least ten grievances concerning his retaliation claims against Shawangunk staff members. See Dkt. No. 113-7 at 65-67, 68, 69, 74, 75, 76, 82, 86, 87, 94. However, grievances SHG-28625-13, SHG-28571-13, SHG-28646-13, SHG-28635-13, SHG-28653-13, SHG-28511-13, SHG-28499-13, SHG-28482-13, SHG-28840-14, SHG-29047-14, as written, fail to give adequate notice of plaintiff's access to the courts claim against Lt. Palen, Sgt. Keane,[9] Sgt. Lelleck, Sgt. Deacon, C.O. Lange, C.O. Marasco, C.O.

---

[9] Defendants only challenge plaintiff's claim that Sgt. Keane retaliated against him on October 7, 2013. See Def. Mem. of Law at 26-27. Defendants acknowledge that plaintiff fully exhausted grievances SHG-28625-13 and SHG-28571-13, which allege nearly identical retaliation complaints, but do not encompass the October 7, 2013 incident. See id.; Cunningham Decl. ¶ 24. In response, plaintiff does not proffer a grievance concerning an alleged

Hoffman, and C.O. Phillips. Although plaintiff details the underlying facts of his claim, plaintiff does not mention Lt. Palen, Sgt. Keane, Sgt. Lelleck, Sgt. Deacon, C.O. Marasco, or C.O. Phillips as parties involved in retaliation. See id. There is nothing in plaintiff's grievances that would alert prison officials to investigate a subsequent denial of access to the courts claim against Lt. Palen, Sgt. Keane, Sgt. Lelleck, Sgt. Deacon, C.O. Marasco, or C.O. Phillips; thus, such claim was not properly grieved. See Turner, 376 F. Supp. 2d at 324. Therefore, because plaintiff failed to exhaust his administrative remedies as to his First Amendment retaliation claims against Lt. Palen, Sgt. Keane, Sgt. Lelleck, Sgt. Deacon, C.O. Marasco, and C.O. Phillips, it is recommended that defendants' motion on this ground be granted.

As to C.O. Hoffman, in response to defendants' motion, plaintiff proffers a grievance dated August 2, 2014 alleging retaliation by C.O. Hoffman. See Dkt. No. 113-7 at 80-81. However, there is no indication that the Shawangunk IGRC ever received this grievance, as there is no stamp on the grievance indicating that it had been received. See Veloz, 339 F. Supp. 2d at 516 (S.D.N.Y. 2004). Ms. Seguin declares that plaintiff never appealed a grievance alleging First Amendment retaliation claims against C.O. Hoffman to CORC. See Seguin Decl. ¶¶ 11, 16, 24, 25. Moreover, even if plaintiff did file this grievance with the Shawangunk IGRC, plaintiff has not proffered evidence demonstrating that he appealed the grievance to the next administrative level, nor does he allege that the grievance process was unavailable. See Veloz, 339 F. Supp. 2d at 516. Therefore, because plaintiff failed to exhaust his administrative remedies as to his First Amendment retaliation claims against C.O. Hoffman, it is recommended that defendants' motion on this ground be granted.

As to C.O. Lange, in response to defendants' motion, plaintiff has proffered two grievances, dated November 15, 2013 and November 21, 2013, alleging that C.O. Lange retaliated against him by denying him showers, recreation, and barber shop privileges. See Dkt. No. 113-7 at 69, 70. The record indicates that the

---

October 7, 2013 incident.

Shawangunk IGRC received the November 15, 2013 grievance on November 25, 2013, and filed it under SHG-28646-13. Id. at 69. The grievance contains a handwritten notation that states, "Already Filed under 28635." Id. DOCCS records demonstrate that plaintiff failed to appeal grievance SHG-28646-13 to CORC. See Seguin Decl. at 12-13. The record does not contain a grievance number SHG-28635-13. The November 21, 2013 grievance that plaintiff submits in opposition to the motion for summary judgment does not contain a stamp indicating receipt by the Shawangunk IGRC; thus, the undersigned is unable to determine if the November 21, 2013 grievance became grievance SHG-28635-13, or if plaintiff filed another grievance that is not a part of this record.

However, although Ms. Seguin declares that "plaintiff never filed an appeal to CORC from a denial of a grievance" relating to C.O. Lange's First Amendment retaliation and Eighth Amendment conditions of confinement claims, Seguin Decl. ¶¶ 11, 25, defendants proffer both the Superintendent's decision and the CORC decision relating to SHG-28635. See Dkt. No. 109-11 ("Lange Decl.") at 7, 9. The Superintendent's decision, dated December 10, 2013, references the denial of exercise and showers, and notes November 29, 2013 as the original filing date of the grievance. Id. at 7. The CORC decision, dated August 13, 2014, addresses plaintiff's allegations in his November 15, 2013 grievance (filed as SHG-28646), but is silent as to the contents of the November 21, 2013 grievance. Id. at 9. The CORC decision also notes November 25, 2013 as the original filing date of the grievance. Id. Thus, the record suggests that plaintiff appealed the allegations contained in the November 15, 2013 letter regarding retaliation and conditions of confinement against C.O. Lange to CORC, and not the allegations contained in the November 21, 2013 letter; however, without further documentary evidence, it remains unclear, and the undersigned cannot determine, whether plaintiff properly exhausted the November 15 and November 21, 2013 claims against C.O. Lange. See Dkt. No. 113-7 at 69, 70; Lange Decl. at 7, 9. Nevertheless, even if the undersigned determined that plaintiff exhausted his administrative remedies as to his retaliation and conditions of confinement claims against C.O.

Lange, both claims fail on the merits.  <u>See</u> subsection II.C.3.iii, D.1 <u>infra</u>.

### d. Medical Indifference:
### Supt. Smith, C.O. Heister

Plaintiff submitted at least four grievances concerning an alleged denial of medical care.  <u>See</u> Dkt. No. 113-7 at 90-93, 95-97.  However, grievances SHG-28504-13, SHG-28711-13, SHG-29047-14, SHG-28891-14 fail to give adequate notice to defendants of plaintiff's medical indifference claims against Supt. Smith and C.O. Heister.  Although plaintiff details the underlying facts of his claims, plaintiff does not mention Supt. Smith or C.O. Heister as denying him medical care.   <u>See</u> <u>id.</u>   In fact, these grievances specifically grieve Dr. Lee's alleged denial of medical permits.  <u>See</u> <u>id.</u>

Neither party has offered a Superintendent's decision or a CORC decision demonstrating whether Supt. Smith or C.O. Heister were interviewed with regard to the medical indifference claim in order to establish their knowledge of the pending grievance.  <u>See</u> <u>Casey</u>, 2018 WL 1399244, at *10.  There is nothing in plaintiff's grievances that would alert prison officials to investigate a subsequent medical indifference claim against Supt. Smith or C.O. Heister; thus, such claim was not properly grieved.  <u>See</u> <u>Turner</u>, 376 F. Supp. 2d at 324.  Therefore, because plaintiff failed to exhaust his administrative remedies as to his Eighth Amendment medical indifference claim against Supt. Smith and C.O. Heister, it is recommended that defendants' motion on this ground be granted.

### e. Conditions of Confinement:
### C.O. Lange

The exhaustion of plaintiff's conditions of confinement claim against C.O. Lange is discussed in conjunction with his retaliation claim.  <u>See</u> subsection II.B.1.c. <u>supra</u>.

### f. Excessive Force and Sexual Assault: C.O. Hoffman;
### Failure to Intervene: C.O. Phillips

Plaintiff proffers a grievance dated August 2, 2014, alleging that C.O. Hoffman searched his hair in a "rough manner, pulling and then bracing his hand on grievant's hair while pulling down on his hair." Dkt. No. 113-7 at 80. Plaintiff also alleges that C.O. Hoffman ripped and tore his hair, and sexually assaulted him. Id. Plaintiff claims that C.O. Phillips "stood by and watch[ed] [his] fellow guard[ ] violate a prisoner's constitutional rights. Id. There is no indication that the Shawangunk IGRC ever received this grievance, as there is no stamp on the grievance indicating that it had been received. See Veloz, 339 F. Supp. 2d at 516. Ms. Seguin declares that plaintiff never appealed a grievance alleging Eighth Amendment excessive force and sexual assault against C.O. Hoffman or failure to intervene against C.O. Phillips to CORC. See Seguin Decl. ¶¶ 16, 17, 24, 25. Moreover, even if plaintiff did file this grievance with the Shawangunk IGRC, plaintiff has not proffered evidence demonstrating that he appealed the grievance to the next administrative level, nor does he allege that the grievance process was unavailable. See Veloz, 339 F. Supp. 2d at 516. Therefore, because plaintiff failed to exhaust his administrative remedies as to his Eighth Amendment excessive force and sexual assault claims against C.O. Hoffman and his Eighth Amendment failure to intervene claim against C.O. Phillips, it is recommended that defendants' motion on this ground be granted.

### g. Equal Protection:
### Supt. Smith, DSP Andrews

As discussed supra, insofar as plaintiff suggests in grievance SHG-28649-13 that Supt. Smith and DSP Andrews violated his equal protection rights in violation of the Fourteenth Amendment by failing to offer Rastafarian religious services, plaintiff provided enough information for defendants to investigate his claim and seek clarification from both the Superintendent and the Deputy Superintendent of Programs. See Casey, 2018 WL 1399244, at *10; see also subsection II.B.1.a. supra. Therefore, as DOCCS records indicate that plaintiff fully exhausted grievance SHG-28649-13, it is recommended that defendants' motion on this ground be denied.

31

### h. Due Process: Lt. Palen

Plaintiff contends that Lt. Palen violated his due process rights in violation of the Fourteenth Amendment in relation to two disciplinary hearings held on November 27, 2013 and June 25, 2014. Am. Compl. ¶ 24; Dkt. No. 107-1 ¶¶ 71, 72. Mr. Cunningham declares that plaintiff failed to file a grievance alleging that Lt. Palen violated his due process rights. Cunningham Decl. ¶¶ 9, 22. In response, plaintiff does not proffer evidence supporting that he filed a grievance alleging due process claims against Lt. Palen. Therefore, because plaintiff failed to exhaust his administrative remedies as to his Fourteenth Amendment due process claim against Lt. Palen, it is recommended that defendants' motion on this ground be granted.

### C. First Amendment

Plaintiff contends that defendants violated his First Amendment rights by (1) preventing him from freely exercising his religion; (2) subjecting him to retaliation; and (3) infringing on his right of access to the courts. See Am. Compl. at 22-28. Defendants argue that plaintiff's First Amendment claims fail as a matter of law and must be dismissed. Def. Mem. of Law at 14-17, 19-20.

### 1. Free Exercise Claims

Plaintiff contends C.O. Alagrin, C.O. Blyth, DSP Andrews, Supt. Smith, and Mr. Rapp violated his right to the free exercise of religion under the First Amendment. Am. Compl. at 24, 26. The First Amendment protects the right to free exercise of religion. See generally Cutter v. Wilkinson, 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003) (citing Pell v. Procunier, 417 U.S. 817, 822 (1974)).

> To assess a free exercise claim, a court must determine (1) whether the practice asserted is religious in the person's scheme of beliefs, and whether

32

> the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological objective.

Farid v. Smith, 850 F.2d 917, 926 (2d Cir. 1988) (citations omitted). This right is not absolute and can be limited due to the inmate's "incarceration and from valid penological objectives — including deterrence of crime, rehabilitation of prisoners, and institutional security." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (citations omitted).

> The Turner Court determined that the four factors to be considered are: 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990) (citing Turner v. Safely, 483 U.S. 78, 89-91 (1987)).

"The governing standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is reasonably related to legitimate penological interests." Benjamin, 905 F.2d at 574 (citations omitted). The same analysis is undertaken when there is an allegation that "an individual dec[ided] to deny a prisoner the ability to engage in some requested religious practice." Ford, 352 F.3d at 595 n.15 (citations omitted).

It is the plaintiff's burden to establish that "the disputed conduct substantially burdens his sincerely held beliefs." Salahuddin v. Goord, 467 F.3d 263, 274-75 (2d Cir. 2006) (citing Ford, 352 F.3d at 591)). However, in assessing whether a plaintiff's belief is sincerely held, courts may not "question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." McEachin v. McGuinnis, 357 F.3d 197, 201 (2d Cir. 2004) (quoting Hernandez v. Comm'r, 490 U.S. 680, 699 (1989)) (internal quotation marks omitted). Once a plaintiff has demonstrated "that the disputed conduct substantially burdens his sincerely held religious beliefs," the burden shifts to the

defendants to establish a legitimate penological purpose. <u>Salahuddin</u>, 467 F.3d at 274-75. If a legitimate penological purpose is identified, the Court must then assess its reasonableness under the <u>Turner</u> factors set forth above.

Defendants do not question the sincerity of plaintiff's religious beliefs; instead, they argue that (1) plaintiff never attempted to exercise his religious beliefs at the Rastafarian classes; and (2) plaintiff never requested dietary restrictions consistent with his religious beliefs. <u>See</u> Def. Mem. of Law at 15-16.

### a. CAD Diet

First, plaintiff alleges DSP Andrews and Mr. Rapp failed to provide him with CAD diet meals for religious purposes. Am. Compl. at 26. Plaintiff's Rastafarian beliefs prohibit him from eating meat, or eating on plates or dishes where meat has previously been served. <u>Id.</u> ¶ 37. Plaintiff contends that his dietary restrictions are "essential to his [Rastafarian] religious belief," and that "[a] vital tenth[10] of [his] religious belief is in . . . maintaining dietary concerns consistent with his religion." Pl. Opp. at 14. Plaintiff never received his religious meal; instead, he was issued standard, regular daily meals that he was unable to eat. Am. Compl. ¶ 37. Courts have held that "[t]he intermittent failure to provide incarcerated individuals with food complying with their religious dietary restrictions is a <u>de minimis</u> imposition falling far short of the substantial burden requirement." <u>Leach v. New York City</u>, No. 12 Civ. 3809(PAC)(JCF), 2013 WL 3984996, at *2 (S.D.N.Y. Aug. 2, 2013); <u>see</u> <u>Skates v. Shusda</u>, No. 9:14-CV-1092, 2016 WL 3882530, at *4 (N.D.N.Y. May 31, 2016) ("Various courts in this circuit addressing [claims involved denial of religious meals] have concluded that such isolated incidents that are not representative of larger, systemic deprivations are constitutionally de minimis and do not rise to a level sufficient to support a First Amendment claim."); <u>JCG v. Ercole</u>, No. 11 Civ. 6844(CM)(JLC), 2014 WL 1630815, at *23 (S.D.N.Y. Apr. 24, 2014) ("The denial

---

[10] It is the Court's understanding that plaintiff means "tenent."

of one meal does not substantially burden Plaintiff's rights under the Free Exercise clause as it constitutes no more than a de minimis harm."). However, plaintiff contends that from the time he entered Shawangunk in July 2013 until he transferred out in August 2014, he never received a CAD meal. Dkt. No. 107-5 ("Pl. Dep.") at 67. Instead, plaintiff ate the food he had in his cell or had purchased at the commissary. Id. at 68. The record suggests that defendants' alleged denial of the CAD meals was more than an isolated incident, and indicative of a "larger, systematic deprivation" sufficient to establish the substantial burden requirement. See id.; Leach, 2013 WL 3984996, at *2; Skates, 2016 WL 3882530, at *4.

Defendants do not readily articulate a legitimate penological purpose behind their alleged denial of plaintiff's CAD meals. Rather, defendants argue that plaintiff never requested specific dietary meals from Mr. Rapp or any other defendant while housed at Shawangunk. Def. Mem. of Law at 15. Defendants proffer the declaration of Mr. Rapp, who declared that, pursuant to Directive 4202, an inmate may receive an "alternative nutritionally adequate diet" after validation and verification of religious need. Dkt. No. 109-19 ("Rapp Decl.") ¶ 7. Moreover, "[n]ewly arriving or in-transit inmates can request a CAD diet and shall receive such until an appropriate Departmental staff member can verify and approve the alternate diet." Id. Mr. Rapp stated that plaintiff never requested the CAD diet from him, and that he did not "have the authority or duty to approve or deny an application for a CAD . . . only ensure that the CAD is available for inmates who are approved to receive CAD or in the process of obtaining the approval." Id. ¶ 8. DSP Andrews further declared that he "was not aware at any time during [p]laintiff's incarceration at Shawangunk that he was requesting special dietary considerations," and that plaintiff "did not make a request for special dietary restrictions from [him]." Dkt. No. 109-1 ("Andrews Decl.") ¶ 11. DSP Andrews averred that if had plaintiff submitted a CAD request form, he "would have been the person to present this form to [Mr. Rapp]." Id. ¶ 12. As such, DSP Andrews "never received any verbal or procedural request for CAD regarding plaintiff." Id.

In response, plaintiff offers a "Request for Religious Meals or Cold Alternative Diet (CAD) Acknowledgment and Consent Form," dated July 26, 2013, prior to plaintiff's transfer to Shawangunk, which indicates that the Upstate Correctional Facility deputy superintendent programs approved plaintiff's CAD request.  Dkt. No. 113-7 at 54, 72.   Additionally, plaintiff provides two letters to the Shawangunk Food Administrator, dated August 5, 2013 and October 2, 2013; three letters to Supt. Smith, dated August 10, 2013, September 15, 2013, and October 30, 2013; and three letters to DSP Andrews, dated August 8, 2013, September 16, 2013, and November 4, 2013, advising them that he had been approved for CAD at Upstate, and had yet to receive CAD meals at Shawangunk.  See Dkt. No. 113-7 at 2, 3, 5, 6, 50, 51, 52.

Mr. Rapp and DSP Andrews both declare that "[a]ny requests made at prior correctional facilities for the CAD would not have followed the inmate and a new request should have been made and processed at Shawangunk."  Andrews Decl. ¶ 8; Rapp Decl. ¶ 7.  However, Directive 4202 makes no reference to a requirement that an inmate must renew a CAD request when he or she is transferred to a different facility. See Andrews Decl. at 13.  Moreover, the CAD request form seems to suggest that an inmate need only request the diet once.  See Dkt. No. 113-7 at 54, 72 ("THIS REGISTRATION FORM IS A ONE TIME REGISTRATION FOR THE CAD . . . or RELIGIOUS MEALS DESIGNATED FOR YOU RELIGION."). It is not clear whether this language means that an inmate only needed to request a CAD meal once per facility, or once during the course of his incarceration, regardless of facility.  See id.  Therefore, it is plausible that the request form could be interpreted as a one-time request that, if approved, would follow plaintiff throughout his incarceration.  Further, there is no indication that DSP Andrews, or Mr. Rapp informed him that he had to reapply at Shawangunk.  Plaintiff maintains that he believed that "[o]nce an application for a Cold Alternative Diet [was] approved and [p]laintiff [was] moved to another prison, he [did] not have to submit another application for the CAD meal."  Dkt. No. 113-6 ¶ 46.  Therefore, because the question of whether plaintiff should have drawn a particular inference from such text is an issue generally decided by

the fact-finder, see Refaat El Badrawi v. United States, No. 07-CV-1074 (JCH), 2011 WL 13086946, at *8 n.5 (D. Conn. May 16, 2011) ("What inferences should be drawn from the text of the handbook is an issue to be decided by a jury."), the undersigned concludes that defendants have not met their burden of establishing a legitimate penological purpose behind their failure to provide plaintiff with CAD meals. Therefore, it is recommended that defendants' motion on this ground be denied.

### b. Rastafarian Religious Services

Second, plaintiff contends that Supt. Smith and DSP Andrews deprived him of his right to attend weekly Rastafarian religious services. Am. Compl. at 26. Plaintiff does not appear to dispute defendants' contention that Shawangunk offered weekly Rastafarian classes; rather, plaintiff claims that the classes are distinct from worshiping services, and services "cannot be held with classes where there are religious items that need[ ] to be in place and rituals conducted during services." Pl. Opp. at 13. Plaintiff declares that "[r]eligious worship[ ]ing services [are] a vital part of [his] adherence to his religious beliefs[ ] and faith, and in order to conduct Rastafarian services, the taboo, i.e., alter, [sic] and the religious items and covering are needed for the alter, [sic] as well [as] candles, frankinscene [sic]/insense [sic], [and] the robes for the levities . . . ." Dkt. No. 113-6 ¶ 46.

"[P]risoners have a constitutional right to participate in congregate religious services." Salahuddin v. Coughlin, 993 F.2d 306, 308 (2d Cir. 1993) (citations omitted). Although the Second Circuit has accorded prison officials great deference in the administration and "responsibility of maintaining order in prisons, . . . prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible." Young v. Coughlin, 866 F.2d 567, 570 (2d Cir. 1989) (citations omitted). Both Supt. Smith and DSP Andrews declared that the Rastafarian religious group reserved a room weekly. Smith Decl. ¶ 6; Andrews Decl. ¶ 6. Although Supt. Smith clarified that statement by affirming that the inmate religious

facilitator had been approved to conduct *classes*, and that there was no outside or DOCCS chaplain, DSP Andrews noted that the inmate religious facilitator had been approved to conduct both *classes and services* at his discretion; such statements signal a discrepancy as to whether Shawangunk offered Rastafarian religious services. See Smith Decl. ¶ 6; Andrews Decl. ¶ 6.  Even though there is no bright-line rule as to "the frequency with which missing religious services . . . becomes a burden of constitutional significance, limits on an inmate's religious exercise which prevent attendance at . . . services once a week or less have routinely been held not to compromise a burden on religious exercise." Simmons v. Adamy, 987 F. Supp. 2d 302, 309 (W.D.N.Y. 2013).  However, plaintiff alleges that throughout the approximately one-year period that he was housed at Shawangunk, he was not provided access to any type of Rastafarian religious service. See Am. Compl. at 26.  Plaintiff claims that he wrote letters to and verbally communicated with Supt. Smith regarding the implementation of Rastafarian religious services, but Supt. Smith disputes that such communication occurred. See Dkt. No. 113-7 at 5, 7; Smith Decl. ¶ 14.  Thus, as plaintiff contends that the ability to worship at a religious service, as opposed to religious class, is a "vital tenth" of his religious beliefs, affording plaintiff special solicitude, the undersigned finds that plaintiff has established that "the disputed conduct substantially burdens his sincerely held beliefs." Salahuddin, 467 F.3d at 274-75; cf. Jean-Laurent v. Los, No. 12-CV-132S(F), 2015 WL 1015383, at *6 (W.D.N.Y. Mar. 9, 2015) ("Courts within the Second Circuit have consistently held that missing two religious services does not pose a substantial burden on an inmate's religion.").

Defendants do not articulate a legitimate penological purpose behind the lack of Rastafarian religious services.  Rather, defendants argue that plaintiff never attempted to worship at the weekly Rastafarian classes, or never had been personally denied the ability to worship. See Def. Mem. of Law at 15.  In response, plaintiff contends that he has practiced Rastafarianism for nearly thirty years, and, thus, does not need to learn about the religion at classes. Pl. Opp. at 13.  Moreover, "[w]orship[ ]ing services cannot be held with

the classes . . . [because there are] religious items that need[ ] to be in place and rituals conducted during the services.  Id.  Thus, it is arguably reasonable that plaintiff did not attend the weekly classes, as he was a longtime member of the religion and knew that the correct tenets for worship would not be available in a classroom setting.  See id.  As defendants do not offer any further justification for the lack of Rastafarian worship services, the undersigned recommends that defendants' motion for summary judgment on this ground be denied.

### i. Qualified Immunity

Defendants argue that, even if plaintiff's First Amendment claims are substantiated, they are entitled to qualified immunity.  Def. Mem. of Law at 27-28.  Qualified immunity shields public officials from being sued for conduct undertaken in the course of their duties so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (internal quotation marks and citation omitted); Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir. 1988).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights."  Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted).  A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  See Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation.  See Aiken v. Nixon, 236 F. Supp. 2d 211, 230 (N.D.N.Y. 2002).

Here, Supt. Smith, DSP Andrews, and Mr. Rapp are not protected by qualified immunity on

plaintiff's First Amendment claims. Addressing the second part of the analysis, it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples," Ford v. McGinnis, 352 F.3d 582, 597 (2d Cir. 2003) (citing Kahane v. Carlson, 527 F.2d 492 (2d Cir. 1975)). Although it is unclear in this Circuit whether an inmate has a clearly established right to religious services of their choosing, courts in other Circuits have held that plaintiff has met his initial burden by demonstrating that his religious exercise was substantially burdened by his inability to access to religious services. Cf. Henderson v. Greeley, No. 6:13-CV-06137, 2015 WL 1280312, at *9-10 (W.D. Ark. Mar. 20, 2015) ("These facts do not support a First Amendment violation claim. Plaintiff was not prevented from studying, praying, observing holy days, or otherwise practicing his religion. He did not grieve the lack of services or even inquire as to what options might be available."); Anderson v. Raemisch, No. 09-CV-132-slc, 2009 WL 806588, at *4 (W.D. Wis. Mar. 26, 2009) (denying dismissal of the plaintiff's free exercise claim and affording him the opportunity to demonstrate "exactly what religious materials and services he wanted but could not have . . . and [ ] how these materials and services affected his ability to practice his religion."). Plaintiff has arguably demonstrated that a lack of Rastafarian religious services amount to a substantial burden on his sincerely-held religious beliefs. See supra, at 37-39; see also Simmons v. Adamy, 987 F. Supp. 2d 302, 308 (W.D.N.Y. 2013) ("[The government's] interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine.") (citations omitted); Muhammad v. City of New York Dep't of Corr., 904 F. Supp. 161, 190-91 (S.D.N.Y. 1995) (assessing whether the plaintiff demonstrated that "the absence of a congregate NOI service is more than an inconvenience and that its absence is substantial and an interference with a tenet or belief that is central to religious doctrine.") (internal quotations omitted). Thus, as Supt. Smith, DSP Andrews, and Mr. Rapp are not entitled to qualified immunity, it is recommended that defendants' motion on this ground be denied.

**c. Hair Searches**

Finally, plaintiff seems to suggest that C.O. Alagrin, C.O. Hoffman, and C.O. Blyth violated his free exercise rights when they touched and pulled his hair, which is braided in dreadlocks, in violation of his Rastafarian beliefs. See Am. Compl. ¶¶ 18, 25, 153; Pl. Opp. at 6. Defendants do not address plaintiff's allegations as they pertain to his First Amendment claim. See Def. Mem. of Law at 5-6 (discussing the searches of plaintiff's hair in the context of the Eighth Amendment). The undersigned finds that the record does not sufficiently support plaintiff's allegation that his dreadlock hairstyle is his "holy temple." Am. Compl. at 24; Pl. Dep. at 53. Therefore, because it is unclear as to how plaintiff's dreadlock hair style relates to his Rastafarian religious beliefs, it is recommended that plaintiff's claim that C.O. Alagrin, C.O. Hoffman, and C.O. Blyth violated his free exercise rights when they touched and pulled his hair be dismissed <u>sua sponte</u> as without merit. Cf. <u>Panayoty v. Annucci</u>, 898 F. Supp. 2d 469, 482-83 (N.D.N.Y. 2012) (concluding that the plaintiffs' detailed declarations explaining their religion's structure and belief system established that the religion was, "for First Amendment purposes, religious in [its] scheme of beliefs and such beliefs [were] sincerely held."); <u>see</u> <u>Cusamano v. Sobek</u>, 604 F. Supp. 2d 416, 457 n.63 (N.D.N.Y. 2009) ("The authority to conduct this sua sponte analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding in forma pauperis] at any time if the court determines that . . . the action . . . is frivolous or malicious[,] . . . fails to state a claim on which relief may be granted[,] . . . or . . . seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall . . . dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim upon which relief may be granted . . . .").

## 2. Access to the Courts

Plaintiff contends that C.O. Pearson, C.O. Alagrin, and Sgt. Keane denied him access to the courts in violation of the First Amendment.  See Am. Compl. ¶¶ 38-41.  A prisoner's right of access to the court system has been anchored by the United States Supreme Court in a variety of sources including "the Article IV Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection, and Due Process Clauses."  Christopher v. Harbury, 536 U.S. 403, 414-15 & n.12 (2002); see Lewis v. Casey, 518 U.S. 343, 346 (1996).  To state a claim for denial of access to the courts, a plaintiff must allege that (1) the defendant acted deliberately and maliciously, and (2) the plaintiff suffered an actual injury.  See Lewis, 518 U.S. at 354; Cusamano v. Sobek, 604 F. Supp. 2d 416, 498 (N.D.N.Y. 2009).  Further, "an inmate must show that the alleged deprivation actually interfered with his access to the courts or prejudiced an existing action."  Herrera v. Scully, 815 F. Supp. 713, 725 (S.D.N.Y. 1993).  Such injury must affect "a nonfrivolous legal claim [which] had been frustrated or was being impeded due to the actions of prison officials."  Warburton v. Underwood, 2 F. Supp. 2d 306, 312 (W.D.N.Y. 1998) (citations omitted); Shine v. Hofman, 548 F. Supp. 2d 112, 117-18 (D. Vt. 2008) (explaining that actual injury "is not satisfied by just any type of frustrated legal claim because the Constitution guarantees only the tools that inmates need in order to attack their sentences . . . and . . . challenge the conditions of their confinement.")  (internal quotation marks and citations omitted).  A mere delay in addressing a inmate's legal action or in communicating with the courts does not amount to a constitutional violation.  See Herrera, 815 F. Supp. at 725.

### a. Actual Injury

Plaintiff contends that Sgt. Keane and C.O. Alagrin confiscated and/or destroyed his legal documents; and C.O. Pearson denied him "special access" to the law library, and general access to the law

library and legal materials. Am. Compl. at 25. Plaintiff further claims that defendants' actions prevented him from (1) appealing a Court of Claims decision because he was "unable to obtain the information, forms[, and] case law that [he] needed to adequately litigate his appeal"; (2) appealing two Article 78 proceedings to the Court of Appeals; and (3) litigating his CPL 440.10 and Error Coram Nobis motions as he was "never provided with the case law and forms he needed[.]" Id. ¶ 41. In his opposition papers, plaintiff somewhat expands on these underlying legal actions. As to his Court of Claims action, plaintiff states that his appeal centered on loss of property and other negligence by the State, and that "had [he] been provided with the materials and/or information, he would have prevailed in his appeal due to his claims having merit." Pl. Opp. at 15. As to his Article 78 petitions, plaintiff contends he challenged disciplinary hearings where the underlying defendants prevented him from attending the hearing, and denied relevant documentary evidence, his right to call witnesses, his right "to fair and impartial," adequate assistance, and a disposition. Id. Plaintiff claims that his Article 78 "motions and appeals had merit and would have prevailed had he been able to adequately appeal his petitions." Id. As to his post-conviction motions, plaintiff alleged ineffective assistance of counsel where his trial counsel misled him "into believing an appeal was filed, and when one was not, counsel abandoned plaintiff." Id. at 15-16. Plaintiff contends that he was unable to litigate these issues because Sgt. Keane and C.O. Alagrin confiscated and/or destroyed his witnesses affidavits. Id.

With respect to plaintiff's Court of Claims and Article 78 appeals, even assuming that C.O. Pearson acted deliberately and maliciously in denying plaintiff access to the law library, the record does not establish that such alleged denial resulted in actual injury. See Lewis, 518 U.S. at 351-52 (explaining the actual injury requirement). Plaintiff's conclusory allegations that "he would have prevailed in his appeal due to his claims having merit" are not supported in the record. Pl. Opp. at 15. Although plaintiff has alleged which legal claims he contends were frustrated, he fails to identify, in nonconclusory terms, if they were meritorious, and how law library access would have supported the viability of such claims, and would have likely lead him

to success on the merits. See Warburton, 2 F. Supp. 2d at 312. Thus, plaintiff has not demonstrated that C.O. Pearson impeded plaintiff's meritorious claims.

However, with respect to plaintiff's post-conviction motions, the undersigned finds that plaintiff has established a question of fact as to whether he suffered actual injury. See Lewis, 518 U.S. at 354. Courts in this Circuit have held that "the intentional removal or destruction of legal materials amounts to a substantive violation of the right of access to the courts." Hampton v. Scully, No. 89 Civ. 6344 (KMW), 1991 WL 18129, at *3 (S.D.N.Y. 1991) (citing Morello v. James, 810 F.2d 344, 346-47 (2d Cir. 1987)). Plaintiff contends that Sgt. Keane and C.O Alagrin confiscated alibi witness affidavits that "were pertinent to his post conviction motion," as some of the witnesses are deceased and others he has since been unable to locate. Pl. Opp. at 16. Because the alleged destruction and/or confiscation of these witness affidavits potentially affects plaintiff's "sentence[ ] . . . the conditions of his confinement," Shine, 548 F. Supp. 2d at 117-18, and does more than "temporarily inconvenience[ ]" plaintiff,[11] the undersigned finds that a reasonable fact finder may conclude that the alleged destruction and/or confiscation of the witness affidavits frustrated or impeded plaintiff's post-conviction motions. See Warburton, 2 F. Supp. 2d at 312. Thus, as plaintiff contends that he was unable to litigate these issues because Sgt. Keane and C.O. Alagrin confiscated and/or destroyed his witnesses affidavits, see Am. Compl. ¶¶ 15-16, plaintiff has established a question of material fact as to whether he suffered actual injury concerning his claims against Sgt. Keane and C.O Alagrin. Cf. Webster v. Fischer, 694 F. Supp. 2d 163, 193 (N.D.N.Y. 2010) (dismissing the plaintiff's access to the courts claim where the plaintiff admitted that the loss of legal paperwork did not interfere with his legal claims).

Insofar as plaintiff suggests that C.O. Pearson failed to provide plaintiff with special access to a notary, and thus, such denial lead to interference with his access to the courts, this claim must fail. To the

---

[11] Smith v. O'Connor, 901 F. Supp. 644, 649 (S.D.N.Y. 1995) ("At best, plaintiff's allegation that his 'law work' was destroyed supports the conclusion that he was temporarily inconvenienced by the loss of his papers. While such inconvenience is understandably frustrating, it does not violate a constitutional right.").

extent that plaintiff requested a notary sometime in January or February 2014, and did not receive a notary until February 5, 2014, "[a] delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." Herrera, 815 F. Supp. at 725; Dkt. No. 107-1 ¶¶ 141, 143. Moreover, plaintiff does not indicate when he initially applied for special access to a notary. Thus, as the record establishes that plaintiff received the notary on February 5, 2014, and because plaintiff failed to allege when he initially requested access to a notary, plaintiff has not demonstrated that C.O. Pearson's alleged denial of earlier access to a notary impeded plaintiff's meritorious claims. See Dkt. No. 107-1 ¶¶ 141, 143.

### b. Deliberate and Malicious Intent

To establish deliberate and malicious intent, a plaintiff must establish that the defendant "took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim." Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003) (quoting Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir. 1997)) (internal quotations omitted). Plaintiff contends that Sgt. Keane and C.O Alagrin "knowingly, intentionally, and deliberately" confiscated and/or destroyed his legal documents because of previous grievances plaintiff filed against them and fellow officers. Am. Compl. at 25. Sgt. Keane declares that he ordered an officer to visually inspect plaintiff's cell in response to plaintiff's complaint that he had been denied toilet paper. Dkt. No. 109-10 ("Keane Decl.") ¶ 8. Sgt. Keane instructed this officer to determine how many rolls of toilet paper plaintiff had in his cell, and at no point did the officer remove anything from plaintiff's cell. Id. Sgt. Keane further declared that he did not order C.O. Alagrin to search plaintiff's cell. Id. ¶ 10.

Absent his conclusory allegations that Sgt. Keane and C.O. Alagrin "knowingly, intentionally, and deliberately" confiscated and/or destroyed his legal material, Am. Compl. at 25, plaintiff has not proffered any evidence that Sgt. Keane or C.O. Alagrin deliberately or maliciously denied him access to the courts.

45

Plaintiff's contention that Sgt. Keane and C.O. Alagrin confiscated his legal documents on October 24, 2013 in retaliation for prior grievances that he filed against them and fellow officers is unsupported by the record. See id.; Dkt. No. 113-7 at 66; Cole v. N.Y.S. Dep't of Corr. Servs., No. 9:10-CV-1098 (NAM/TWD), 2012 WL 4491825, at *27 (N.D.N.Y. Aug. 31, 2012) (recommending dismissal of the plaintiff's claim where the plaintiff's contention that the defendants retaliated against him for prior grievances was "unsupported by the record or any competent evidence, and instead appears to be the product of sheer surmise on plaintiff's part."). Moreover, to the extent that plaintiff argues that Sgt. Keane and C.O. Alagrin denied him access to the courts in retaliation for grievances filed against other officers, courts have found that "it is difficult to establish one defendant's retaliation for complaints against another defendant." Hare v. Hayden, No. 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011); see Roseboro v. Gillespie, 791 F. Supp. 2d 353, 369 ("[E]ven assuming that Counselor Wingate knew about Roseboro's grievance against Officer Gillespie, he has failed to provide any basis to believe that Counselor Wingate retaliated for a grievance that she was not personally named in."). Plaintiff fails to establish that Sgt. Keane and C.O. Alagrin were aware of the grievances filed against unnamed fellow officers or that such offensive conduct was taken in retaliation for his prior grievances against Sgt. Keane and C.O. Alagrin. See Gayle v. Walker, 182 F.3d 899, 1999 WL 464981 (Table), at *1 (2d Cir. 1999) (dismissing the plaintiff's claim where "it had not been proven that [the defendants'] actions were take in retaliation for this prior grievances."). Thus, the undersigned finds that plaintiff has failed to establish that Sgt. Keane and C.O. Alagrin deliberately and maliciously interfered with his access to the courts in retaliation for his filing past grievances against them or other officers.

Accordingly, it is recommended that defendants' motion, as it pertains to plaintiff's access to the courts claim against Sgt. Keane, C.O Alagrin, and C.O. Marasco, be granted.

### 3. Retaliation

Plaintiff contends that C.O. Alagrin, C.O. Lange, C.O. Blyth, C.O. Phillips, C.O. Hoffman, C.O. Pearson, C.O. Strang, C.O. Zibler, C.O. Morgenthaler, C.O. Heister, Sgt. Keane, Sgt. Deacon, Lt. Gardner, Lt. Palen, Dr. Lee, and Supt. Smith retaliated against him in violation of the First Amendment. See generally Am. Compl.[12] Defendants argue that (1) with respect to C.O. Phillips and Sgt. Deacon, plaintiff failed to establish that either defendant took adverse action against him; and (2) with respect to the remaining defendants, plaintiff "cannot credibly argue that he has been prevented from exercising his Constitutional rights to file grievances or that his speech has been chilled" as he has filed over three hundred grievances with DOCCS. Def. Mem. of Law at 20.

Courts are to "approach [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]'" See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, N. A., 534 U.S. 506 (2002)). A retaliation claim under Section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); South Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009). "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" Espinal, 558 F.3d at 128 (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004), overruled on other grounds by Swierkiewicz, 534 U.S. at 560)). To demonstrate the adverse action element, a plaintiff must show that the defendant's "'retaliatory conduct . . . would deter a similarly situated individual of ordinary firmness from exercising his or her

---

[12] For the sake of completeness, the undersigned addresses claims against C.O. Phillips, C.O. Hoffman, Sgt. Deacon, and Lt. Palen even though the undersigned has recommended that the Court dismiss claims against them as unexhausted. See subsection II.B.1. supra.

constitutional rights . . . .   Otherwise, the retaliatory act is simply de minimis, and therefore outside the ambit

of constitutional protection.'"   Roseboro, 791 F. Supp. 2d at 366  (quoting Dawes, 239 F.3d at 292-93).

"Types of circumstantial evidence that can show a causal connection between the protected conduct and the

alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary

hearing, and statements by defendants as to their motives."  Barclay v. N.Y., 477 F. Supp. 2d 546, 558

(N.D.N.Y. 2007).  If the plaintiff meets this burden, the defendants must show, by a preponderance of the

evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the

protected conduct."  Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected

activity.  See Espinal, 558 F.3d at 128.  The Second Circuit has concluded that use of the prison grievance

system constitutes a protected activity.  See Gill, 389 F.3d at 384; Franco v. Kelly, 854 F.2d 584, 589 (2d Cir.

1988) ("Moreover, intentional obstruction of a prisoner's right to seek redress of grievances is precisely the

sort of oppression that section 1983 is intended to remedy.") (alteration and internal quotation marks

omitted); see also Roseboro, 791 F. Supp. 2d at 367 (finding that the filing of a grievance is a protected

activity); Mateo v. Fischer, 682 F. Supp. 2d 423, 433 (S.D.N.Y. 2010) (same).  As plaintiff alleges that C.O.

Alagrin, C.O. Lange, C.O. Blyth, C.O.  Marasco, C.O. Phillips, C.O. Hoffman, C.O. Heister, C.O. Pearson,

C.O. Strang, C.O. Zibler, C.O. Morgenthaler, Sgt. Keane, Sgt. Lelleck, Sgt. Deacon, Lt. Gardner, Lt. Palen,

Dr. Lee, and Supt. Smith retaliated against him because of grievances plaintiff filed against them, plaintiff

has satisfied the first prong of the test as he has engaged in a protected activity.  See Gill, 389 F.3d at 384;

Am. Compl. at 22-25; Dkt. No. 113-7 at 56-97 (detailing plaintiff's grievances against defendants).

As an initial matter, the undersigned will address defendants' argument that "plaintiff's grievance

activities were not curtailed by any alleged retaliation as the plaintiff has over three hundred active

grievances filed with DOCCS dated before, during, and after the occurrences alleged in the amended

48

complaint," therefore negating any allegation that his speech has been chilled.  Def. Mem. of Law at 20.

Defendants' argument that plaintiff's retaliation claims must fail solely because he continued to file

grievances is contradicted by case law.  It is well-settled that "in proving adverse action, a prisoner need not

demonstrate an actual or subjective chill – that is, that he was dissuaded from further exercising his own

rights.  In other words, in the context of prisoner retaliation suits, a prisoner need not demonstrate 'actual

chill.'"  Lashley v. Wakefield, 483 F. Supp. 2d 297, 300 (W.D.N.Y. 2007) (quoting Gill, 389 F.3d at 381,

384); see Gill, 389 F.3d at 381 ("[The Second Circuit] made clear that this objective test applies even where

a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and

lawsuits.").  Thus, defendants' argument is meritless.


### a. C.O. Phillips and Sgt. Deacon

Plaintiff contends that on August 2, 2014, C.O. Phillips failed to intervene while C.O. Hoffman

sexually assaulted him in retaliation for his prior grievances against C.O. Zibler and fellow officers.[13]  See

Am. Compl. at 13, 25.  Plaintiff claims that C.O. Phillips informed him that the sexual assault would not have

happened if plaintiff had not written a grievance against C.O. Zibler.  Id. at 13.  Plaintiff fails to demonstrate

that C.O. Phillip's conduct was motivated by retaliation.  Aside from his conclusory allegations, plaintiff does

not proffer evidence that C.O. Phillips knew of his grievances against C.O. Zibler.  Even assuming that C.O.

Phillips knew of such grievances, plaintiff "has failed to provide any basis to believe that [C.O. Phillips]

retaliated for a grievance that [he] was not personally named in."  Roseboro, 791 F. Supp. 2d at 369.  Thus,

plaintiff has failed to establish that C.O. Phillips' failure to intervene was causally connected to plaintiff's

prior grievance activity as he did not demonstrate that C.O. Phillips failed to act because of prior grievances

---

[13] It is well-settled that plaintiff cannot "establish one defendant's retaliation for complaints against another
defendant." Hare, 2011 WL 1453789 at *4; see Roseboro v. Gillespie, 791 F. Supp. 2d 353, 369 ("[E]ven assuming
that Counselor Wingate knew about Roseboro's grievance against Officer Gillespie, he has failed to provide any
basis to believe that Counselor Wingate retaliated for a grievance that she was not personally named in.").

or that he knew about the grievances.

As to Sgt. Deacon, plaintiff contends that Sgt. Deacon "knowingly allow[ed] and/or work[ed] in conjunction with [his] subordinates to violate [his] constitutional rights."  Am. Compl. ¶ 35.[14]  Plaintiff does allege any facts, and the record does not indicate, that Sgt. Deacon took any adverse action against plaintiff that "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights."  Roseboro, 791 F. Supp. 2d at 366 (quoting Dawes, 239 F.3d at 292-93).  Thus, it is recommended that defendants' motion, insofar as it alleges First Amendment retaliation claims against C.O. Phillip and Sgt. Deacon, be granted.

### b. C.O. Morgenthaler

Insofar as plaintiff contends that C.O. Morgenthaler verbally harassed and threatened to file grievances against him in retaliation for filing grievances, Am. Compl. ¶ 23, verbal harassment or threats, absent injury, is generally insufficient to rise to the level of a constitutional violation.  See Ramirez v. Holmes, 921 F. Supp. 204, 210 (S.D.N.Y. 1996) ("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983.").  As plaintiff fails to allege that C.O. Morgenthaler subjected him to an appreciable injury, it is recommended that defendants' motion on this ground be granted.

---

[14] To the extent that plaintiff may seek to allege a conspiracy claim against Sgt. Deacon, it must be denied as "it is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion." Thomas v. Egan, 1 F. App'x 52, 54 (2d Cir. 2001) (summary order) (citing Beckman v. United States Postal Serv., 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000)); see Jones v. Goord, 435 F. Supp. 2d 221, 261 (S.D.N.Y. 2006) (same).  Nevertheless, plaintiff's conclusory allegations against Sgt. Deacon fail to establish a prima facie conspiracy claim — i.e., "an agreement between two or more defendants to act in concert to inflict an unconstitutional injury, and an overt act done in furtherance of that goal causing damages." McCloud v. Prack, 55 F. Supp. 3d 478, 482 (W.D.N.Y. 2014) (citation omitted).  There is no indication in the record that Sgt. Deacon agreed to act in concert with any Shawangunk staff to retaliate against plaintiff.  As "[c]onclusory allegations of a conspiracy will not suffice," id., plaintiff fails to set forth a conspiracy claim.

**c. Remaining Defendants**

Plaintiff sets forth varying claims of retaliation against defendants Lt. Gardner, Lt. Palen, Sgt. Keane, Dr. Lee, C.O. Lange, C.O. Hoffman, C.O. Alagrin, C.O. Blyth, C.O. Strang, and C.O. Zibler.

**i. Pat-Frisks and Hair Searches**

Plaintiff contends that C.O. Hoffman, C.O. Alagrin, and C.O. Blyth pat-frisked him and searched his hair in retaliation for his prior grievances against them and their subordinates.[15]  Am. Compl. at 24.  Plaintiff further contends that C.O. Strang, C.O. Zibler, and C.O. Hoffman sexually assaulted him in retaliation for his prior grievances against them and their subordinates.  Id. at 25.

To the extent that plaintiff claims that C.O. Hoffman, C.O. Alagrin, and C.O. Blyth pat-frisked and searched his hair in retaliation for his protected conduct, the undersigned finds that such conduct does not amount to adverse action warranting First Amendment protection because de minimis conduct does not amount to actionable retaliation.  See Roseboro, 791 F. Supp. 2d at 366 (quoting Dawes, 239 F.3d at 292-93). Plaintiff's allegations that C.O. Alagrin, C.O. Blyth, and C.O. Hoffman searched his hair and pat-frisked him on November 9, 2013; December 3, 2013; and August 2, 2014 are insufficient to deter an inmate of ordinary firmness from exercising his First Amendment rights as it is well-settled that "pat frisks, even if conducted for retaliatory reasons, cannot constitute an adverse action as required to support a First Amendment retaliation claim."  Amaker v. Fischer, No. 10-CV-0977A (Sr), 2014 WL 8663246, at *9 (W.D.N.Y. Aug. 27, 2014); Am. Compl. ¶¶ 18, 25, 33.

Insofar as plaintiff contends that defendants searched his hair because of their knowledge that the search would violate his religious beliefs, C.O. Blyth and C.O. Hoffman both declared that at no time during the pat-frisk did they search, tear, rip, or otherwise come in contact with plaintiff's hair.  See Blyth Decl. ¶

---

[15]  See footnote 13 supra, at 49.

10; Hoffman Decl. ¶ 7.  However, both defendants contend that they would have taken the alleged adverse action against plaintiff "even in the absence of the protected conduct."  Mount Healthy, 429 U.S. at 287. C.O. Hoffman declares that "[p]at frisks are routine procedure for keeplock inmates," and on his recollection and belief, the August 2, 2014 pat-frisk was conducted "without incident."  Dkt. No. 109-8 ("Hoffman Decl.") ¶ 6.  C.O. Blyth declared that he "pat frisked [p]laintiff outside of his cell and escorted him to the tier office for an interview.  Plaintiff complied with the pat frisk procedure without incident."  Dkt. No. 109-2 ("Blyth Decl.") ¶ 6.  C.O. Blyth further declared that a pat-frisk of a keeplock inmate prior to leaving his or her housing block is "standard procedure."  Id.  Thus, C.O. Blyth and C.O. Hoffman have established that they would have pat-frisked plaintiff, including his hair, absent his filing of grievances.[16]  Therefore, it is recommended that defendants' motion, insofar as it relates to retaliation claims against C.O. Hoffman, C.O. Alagrin, and C.O. Blyth, be granted.

### ii. Sexual Assault

Plaintiff argues that C.O. Strang, C.O. Zibler, and C.O. Hoffman sexually assaulted him in retaliation for his prior grievances against them and their subordinates.[17]  Specifically, plaintiff contends that (1) on September 24, 2013, C.O. Strang squeezed his genitals during a pat frisk, and threatened to sexually assault him if he did not stop filing grievances, Am. Compl. ¶ 9; (2) on February 10, 2014, C.O. Zibler grabbed plaintiff's genitals during a pat frisk, and stated that he would "get [plaintiff] for writing him up," id. ¶ 29; and (3) on August 2, 2014,[18] C.O. Hoffman squeezed plaintiff's genitals, id. ¶ 33.  As to C.O. Strang and C.O.

---

[16] Defendants do not proffer a declaration from C.O. Alagrin.

[17] See footnote 13 supra, at 49.

[18] Plaintiff alleges two retaliation claims against C.O. Hoffman pertaining to incidents on August 2, 2014. Plaintiff claims that C.O. Hoffman pat-frisked him and searched his hair on his way to recreation in violation of his religious beliefs.  Am. Compl. ¶ 33.  The alleged sexual assault occurred on plaintiff's return from recreation.  See id.

Zibler, a reasonable fact finder could conclude that an officer's grabbing and squeezing of an inmate's genitals while issuing verbal threats against filing grievances would deter a similarly-situated inmate from engaging in that protected activity.  See Roseboro, 791 F. Supp. 2d at 366 (quoting Dawes, 239 F.3d at 292-93); see also Vincent v. Sitnewski, 117 F. Supp. 3d 329, 338 (S.D.N.Y. 2015) ("Is sexual groping by an officer who is simultaneously issuing verbal threats the kind of action that would deter a person of 'ordinary firmness' from exercising his or her constitutional rights? This is plainly a question of fact . . . [that] would be inappropriate for the Court to resolve the issue at this stage.").  Moreover, it is clear that C.O. Strang and C.O. Zibler's statements threatening further sexual assault for writing grievances supports an inference that plaintiff's past grievances played a substantial part in the sexual assault.  See Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) ("The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action.").  Thus, reasonable fact finder could conclude that C.O. Strang and C.O. Zibler sexually assaulted plaintiff in retaliation for his filing prior grievances.  Accordingly, it is recommended that defendants' motion, insofar as it relates to retaliation claims against C.O. Strang and C.O. Zibler, be denied.[19]

However, with respect to C.O. Hoffman, plaintiff does not allege that C.O. Hoffman made any statements regarding his motivation behind any alleged sexual assault.  See Am. Compl. ¶ 33.  Plaintiff seems to suggest that C.O. Hoffman informed him "when he was leaving the disciplinary office," that the August 2, 2014 sexual assault would not have happened had plaintiff not written a grievance regarding C.O. Zibler.  See id. ¶ 34.  Even if the undersigned attributed this statement to C.O. Hoffman, plaintiff fails to state when C.O. Hoffman made this comment and under what circumstances; thus, plaintiff fails to establish that this statement was causally connected to the alleged sexual assault.  See Baskerville, 224 F. Supp. 2d at 732.  Accordingly, it is recommended that defendants motion, insofar as it relates to retaliation claims against C.O.

---

[19] C.O. Strang and C.O. Zibler are not entitled to qualified immunity on this claim for the same reasons discussed below. See subsection II.C.2.b.i. supra.

Hoffman, be granted.

### ii.  Confiscation and/or Destruction of Legal Documents

Plaintiff contends that Sgt. Keane and C.O. Alagrin confiscated or destroyed his legal materials in retaliation for prior grievances he filed against defendants.  Am. Compl. at 25.  Plaintiff contends that when he inquired with C.O. Alagrin as to the location of his missing legal documents, C.O. Alagrin denied taking any documents out of plaintiff's cell, and warned him against filing further lawsuits and grievances.  Id. ¶ 17.  Such statement does not affirmatively establish retaliatory intent as there is no indication that plaintiff's grievances were a substantial factor in Sgt. Keane and C.O. Alagrin's decision to destroy and/or confiscate plaintiff's legal documents, and plaintiff has not proffered evidence of such intent.  See Baskerville, 224 F. Supp. 2d at 732 ("The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action."); Dkt. No. 113-7 at 66; cf. Lowrance v. Coughlin, 862 F. Supp. 1090, 1103 (S.D.N.Y. 1994) (concluding that the plaintiff had "successfully demonstrated that the exercise of his First Amendment rights was a substantial factor motivating" the defendants' adverse action where the plaintiff proffered documentary evidence, including memoranda from the Superintendent ridiculing Muslims and the plaintiff's eating habits).  Therefore, absent evidence of such connection, it is recommended that defendants' motion on this ground be granted.

### iii. Conditions of Confinement

Plaintiff contends that, while he was housed in keeplock, C.O. Lange denied him recreation and showers in retaliation for grievances filed against him and other officers.[20]  Am. Compl. at 24.  Plaintiff claims that on October 26, 2013, C.O. Lange instructed plaintiff to "drop his pending grievances."  Id. ¶ 20.

---

[20]  See footnote 13 supra, at 49.

When plaintiff refused, C.O. Lange said that he would "regret his decision." Id. On November 2, 2013, C.O. Lange denied plaintiff recreation, and stated that he would continue to deny plaintiff recreation and showers if he kept complaining. Id. Plaintiff alleges C.O. Lange denied plaintiff recreation on five other occasions, and showers and the barber shop on one occasion each. Id. ¶¶ 21, 22.

The undersigned finds that C.O. Lange's alleged denial of showers and recreation is insufficient to constitute adverse action. "Case law suggests that the isolated or sporadic denial of privileges do not suffice to state a claim of actionable retaliation." Lunney v. Brureton, No. 04 Civ. 2438(LAK)(GWG), 2007 WL 1544629, at *20 (S.D.N.Y. May 29, 2007) (citing inter alia Davidson v. Chestnut, 193 F.3d 144, 150 (2d Cir. 1999)). Plaintiff himself alleges that C.O. Lange denied him recreation on six occasions and showers on two occasions, and there is no indication such denial was routine or constant. Id. ¶¶ 20, 21, 22. Thus, the undersigned finds that C.O. Lange's alleged denial of recreation and showers is de minimis, and, thus, does not constitute adverse action. Moreover, even though "[i]t is true that some verbal threats, even if not serious enough to implicate the Eighth Amendment, can constitute an adverse action," Mateo v. Fischer, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010), verbal threats must be accompanied by physical force to create a constitutional claim, and there is no indication that C.O. Lange threatened plaintiff with physical force. See, e.g., Jermosen v. Coughlin, 878 F. Supp. 444, 449 (N.D.N.Y. 1995). Therefore, as C.O. Lange's alleged intermittent denial of privileges does not amount to adverse action, it is recommended that defendants' motion on this ground be granted.

### iv. Denial of Medical Care

Plaintiff contends that Dr. Lee denied him medical care in retaliation for plaintiff's prior grievances against him and the medical staff.[21] Am. Compl. at 22-23. As stated infra, plaintiff has failed to establish

---

[21] See footnote 13 supra, at 49.

adverse action, as the undersigned concludes that Dr. Lee provided him with adequate medical care.  See subsection II.D.4.b infra.  Moreover, even assuming Dr. Lee provided plaintiff with deficient medical care, there is no indication that plaintiff's grievances were a substantial or motivating factor in Dr. Lee's treatment. Plaintiff's conclusory allegations that Dr. Lee "[did] not like [plaintiff] because [he] wrote grievances against him and the medical staff," Am. Compl. ¶ 45, do not demonstrate that Dr. Lee denied plaintiff medical care or delayed renewal of permits in response any specific grievance filed against him.  See Youmans v. Schriro, No. 12 Civ. 3690(PAE)(JCF), 2013 WL 6284422, at *6 (S.D.N.Y. Dec. 3, 2013) ("[The plaintiff's] conclusory allegation that Dr. Richards denied him treatments that the plaintiff might have preferred, without more, does not suggest that Dr. Richards' actions would 'chill a person of ordinary firmness' from filing future grievances.") (citation omitted).  Thus, plaintiff fails to establish that the alleged adverse action was causally connected to his protected activity, his filing grievances.  Accordingly, it is recommended that defendants' motion on this ground be granted.

### v. Due Process

Plaintiff contends that Lt. Gardner and Lt. Palen denied him his right to attend disciplinary hearings in retaliation for prior grievances filed against him and his subordinates.[22]  Am. Compl. at 23.  As stated infra, the record is clear that plaintiff waived his due process objections when he refused to attend his disciplinary hearings.  See subsection II.D.1.b.i. infra.  Moreover, even assuming a due process violation, there is no indication that plaintiff's grievances were a substantial or motivating factor in that alleged deprivation.  It has been held that  "[p]risoner plaintiffs may rely on circumstantial evidence to prove their retaliation claims, such as temporal proximity of events, but in doing so, the plaintiff also must usually provide some non-conclusory evidence that raises an inference of "retaliatory animus" in order to proceed to trial."  Parks

---

[22]  See footnote 13 supra, at 49.

v. Blanchette, 144 F. Supp. 3d 282, 331 (D. Conn. 2015).  Lt. Gardner and Lt. Palen's alleged off-the-record comments regarding plaintiff's grievances — that if plaintiff ceased filing grievances, the Shawangunk staff would "stop fucking with [him], and confining [him]," and that his grievances would be found unsubstantiated, Am. Compl. ¶¶ 24, 51 — by themselves, are conclusory, and, therefore, insufficient to "raise[ ] an inference of a 'retaliatory animus.'"  See Woodward v. Ali, No. 9:13-CV-1304 (LEK/RFT),  2015 WL 5711899, at *14 (N.D.N.Y. Sept. 29, 2015) (denying the plaintiff's motion for summary judgment as to his retaliation claim where the plaintiff "has failed to offer anything other than conclusory allegations and speculation that [the defendant] acted with any retaliatory animus.  Plaintiff merely cites to the allegations in his complaint to demonstrate that there are no material issues of fact.").  Thus, plaintiff fails to establish that the alleged adverse action was causally connected to his grievances.  Accordingly, it is recommended that defendants' motion on this ground be granted.

### vi. Retaliatory Drug Testing

Plaintiff contends that Lt. Gardner subjected him to urinalysis testing in retaliation for grievances. Am. Compl. ¶ 50.  It is unsettled in this Circuit whether subjecting an inmate to drug testing constitutes an adverse action.  See Michalski v. Semple, No. 3:16-CV-2039 (VAB), 2017 WL 4475994, at *9 (D. Conn. Oct. 6, 2017) ("Although close in time to the protected conduct, the requirement that Michalski undergo urinalysis drug testing, standing alone, does not plausibly rise to the level of disciplinary conduct sufficient for a retaliation claim, namely because [p]risoners are required to tolerate more serious conduct than public employees or private citizens before stating a retaliation claim.") (internal citations and quotation marks omitted); Allen v. Graham, No. 9:16-CV-47 (GTS/ATB), 2017 WL 9511168, at *12 (N.D.N.Y. Sept. 26, 2017) ("[A] single urinalysis test does not rise to the level of an adverse action that would deter an inmate from asserting his rights."); Holmes v. Fischer, No. 09-CV-00829 (F), 2016 WL 552962, at *10 (W.D.N.Y.

Feb. 10, 2016) ("Insofar as urinalysis involves both embarrassment and potential punishment, being required to submit to a urinalysis constitutes an adverse action.") (internal quotation marks and citations omitted); Bumpus v. Canfield, 495 F. Supp. 2d 316, 327 (W.D.N.Y. 2007) ("Urine tests are a fact of prison life, and I do not find that one urine test would chill a prisoner of ordinary firmness from filing grievances.") (internal citations omitted). Although there is some question as to the frequency of the urinalysis testing, Lt. Gardner declared that, pursuant to DOCCS Directive 4927, he "requested said urinalysis as suspicion testing after receipt of information that [p]laintiff used drugs[.]" Dkt. No. 109-5 ("Gardner Decl.") ¶¶ 12, 13; 65-66 (detailing that the March 2014 urinalysis testing was based on suspicion and pursuant to the Request for Urinalysis form); 72 (detailing Directive 4973 procedure for urinalysis testing). Plaintiff does not argue, and there is no indication, that the justification offered by Lt. Gardner was a pretext. See Gill v. Calescibetta, No. 9:00-CV-1553 (GTS/DEP), 2009 WL 890661, at *9 (N.D.N.Y. Mar. 31, 2009) ("Once [a legitimate non-discriminatory] reason [for taking such action] has been cited [by the defendants], the burden of production reverts to the plaintiff, who retains the ultimate burden of establishing both pretext and that retaliation was a motivating factor in the determination, by a preponderance of evidence."). Thus, plaintiff fails to establish that the alleged adverse action was causally connected to his grievances. Accordingly, it is recommended that defendants' motion on this ground be granted.[23]

### D. Eighth Amendment

Plaintiff contends that defendants violated his Eighth Amendment rights by (1) subjecting him to cruel and unusual punishment through the conditions of his confinement; (2) subjecting him to excessive

---

[23] Insofar as plaintiff suggests that Lt. Gardner violated DOCCS Directive 4927 by approving his own request for urinalysis testing, Lt. Gardner's alleged failure to follow a DOCCS directive does not amount to a constitutional violation. See Burroughs v. Petrone, 138 F. Supp. 3d 182, 219 (N.D.N.Y. 2015); Sanders v. Gifford, No. 11-CV-0326, 2014 WL 5662775, at *4 (N.D.N.Y. Nov. 4, 2014).

force and sexual assault; (3) failing to intervene; and (4) denying him adequate medical care. See Am. Compl. at 22-24.

### 1. Conditions of Confinement

Plaintiff contends that C.O. Lange denied him "access to [ ] one hour out door [sic] exercise on numerous occasions." Am. Compl. at 24. Plaintiff further contends that C.O. Lange denied him showers while in keeplock, and that he only received three showers per week. Id. C.O. Lange denies depriving plaintiff of showers and recreation. See Def. Mem. of Law at 12-13. "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 832 (1994). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . . and subjective test." Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted). Objectively, the deprivation must be "sufficiently serious [such] that [the inmate] was denied the minimal civilized measure of life's necessities[.]" Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (internal quotation marks and citation omitted). To satisfy the subjective prong of the test, the inmate must show that "the defendant official acted with a sufficiently culpable state of mind . . . such as deliberate indifference to inmate health or safety." Id. (internal quotation marks and citation omitted); see also Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002).

The objective prong of the test can be satisfied where the plaintiff pleads "conditions [that] either alone or in combination, pose an unreasonable risk of serious damage to [the plaintiff's] health[.]" Darnell v. Pineiro, 849 F.3d 17, 30 (2d Cir. 2017) (quoting Walker, 717 F.3d at 125). There is no "static test" to determine whether an alleged deprivation is sufficiently serious to satisfy the objective prong. Id. Rather, courts must determine whether the conditions violate "contemporary standards of decency." Id. (quoting

Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995)) (additional citation omitted).

It is well-settled that a temporary denial of privileges such as showers and recreation are insufficient to establish an Eighth Amendment violation. See Greene v. Furman, 610 F. Supp. 2d 234, 237 (W.D.N.Y. 2009) ("[P]laintiff's allegations that he was denied exercise, showers and haircuts do not suffice to state an Eighth Amendment claim based on his conditions of confinement . . . .There is no indication in the complaint that the deprivations alleged by plaintiff were in any way atypical, that they resulted in any physical injury, or that they amounted to cruel and unusual punishment in violation of the Eighth Amendment."); Crichlow v. Fischer, No. 9:17-CV-00194 (TJM/TWD), 2017 WL 6466556, at *15 (N.D.N.Y. Sept. 5, 2017) ("[A] conditions of confinement claim concerning the denial of showers rises to the level of an Eighth Amendment violation only when such a denial deprives the prisoner of basic human needs. As such, courts are reluctant to consider the temporary deprivation of showers a constitutional violation.") (internal quotation marks and citations omitted). Plaintiff's allegation that C.O. Lange denied plaintiff recreation on six occasions, and showers and the barbershop each on one occasion, Am. Compl. ¶¶ 20, 21, 22, is not sufficiently serious to warrant constitutional protection. See McCoy v. Goord, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003) (concluding that a two-week suspension of shower privileges is not sufficiently serious to constitute an Eighth Amendment violation). Moreover, there is no indication that these alleged denials of privileges resulted in plaintiff's injury or that they were atypical. See Greene, 610 F. Supp. 2d at 237. Insofar as plaintiff alleges that he only received three showers per week, Am. Compl. ¶ 24, showers are only offered three times a week for keeplock inmates. See Lange Decl. ¶ 5("Call outs for shower . . . for keeplock inmates are offered on Monday, Wednesday, and Friday."). Thus, plaintiff does not demonstrate that three showers per week was atypical. Therefore, as a temporary denial of privileges does not amount to an Eighth Amendment violation, it is recommended that defendants' motion on this ground be granted.

**2. Excessive Force and Sexual Assault**

Plaintiff alleges that C.O. Strang, C.O. Alagrin, C.O. Zibler, and C.O. Hoffman subjected him to excessive force and sexual assault during a series of pat frisks.  Specifically, plaintiff alleges that (1) on September 24, 2013, C.O. Strang "grabbed [his] penis[ ] testicles, squeezing them so hard it caused [plaintiff] to cry out[,] . . . [and] [ran] his hand between [plaintiff's] buttock cheeks to [his] anal hole roughly applying pressure," Am. Compl. ¶ 9; (2) on October 25, 2013, C.O. Alagrin pat frisked him prior to keeplock recreation and "forcefully grabbed [his] hair searching it in an aggressive manner," and tearing and/or ripping out his dreadlocks, id. ¶ 18; (3) On November 9, 2013, C.O. Alagrin pat-frisked him, and searched his hair in a "rough manner, pulling/yanking on [his] hair[, and] tearing/ripping several dread-locks out, id.; (4) on February 10, 2014, C.O. Zibler "ran his hands up [plaintiff's] legs and grabbed [his] penis and testicles," and "wedged [plaintiff's pants between [his] buttocks cheeks" and "press[ed] on [his] anal hole," id. ¶ 29; and

(5) on August 2, 2014, C.O. Hoffman "search[ed] [his] hair in a rough manner, pulling [his] hair downwards, then bracing on [his] hair with his forearm," ripped and tore his dreadlocks out, and "squeez[ed] [his] testicles and penis while . . . [running] his hands between [plaintiff's] buttocks cheeks to his anal hole applying pressure [sic]," id. ¶ 33.  Defendants contend that "[a]ll of plaintiff's claims relate to physical touching of plaintiff by defendant in connection with pat frisks," and, as such, the force was applied in a good faith effort to maintain or restore discipline.  Def. Mem. of Law at 5.

"The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials." Crawford v. Cuomo, 796 F.3d 252, 256 (2d Cir. 2015) (quoting Wilson v. Seiter, 501 U.S. 294, 297 (1991)). To state a prima facie claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements.  See Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999).  The objective element of the excessive force analysis is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection."

61

Hudson v. McMillian, 503 U.S. 1, 9 (1992) (internal citations omitted); Blyden, 186 F.3d at 262. However, "the malicious use of force to cause harm [ ] constitute[s an] Eighth Amendment violation per se[,]" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9). "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10 (internal quotation marks and citations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Sims v. Artuz, 230 F.3d 14, 22 (2d Cir. 2000) (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Sims, 230 F.3d at 21 (internal quotation marks and citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Id. (quoting Hudson, 503 U.S. at 7). In determining whether a defendant acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "[1] the extent of the injury and the mental state of the defendant[;] [2] . . . the need for the application of force; [3] the correlation between that need and the amount of force used; [4] the threat reasonably perceived by the defendants; and [5] any efforts made by the defendants to temper the severity of a forceful response." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

### a. October 25, 2013; November 9, 2013; and August 2, 2014
### Incidents of Hair Ripping and/or Tearing

To the extent that plaintiff contends that "rough" or "aggressive" search of his hair, or the ripping of his dreadlocks constitutes excessive force, the undersigned disagrees. The Eighth Amendment protection "does not extend to 'de minimis uses of physical force, provided that the use of force is not of a sort

repugnant to the conscience of mankind.'" Sims v. Artuz, 230 F.3d 14, 21 (2d Cir. 2000) (quoting Hudson, 503 U.S. at 10). In Shepherd v. Fischer, a case also involving plaintiff, plaintiff alleged that the defendants "'knowingly and intentionally use[d] excessive force by ripping/tearing [his] dread locks' during searches." Shepherd v. Fisher, No. 08-CV-9297 (RA), 2017 WL 666213, at *32 n.35 (S.D.N.Y. Feb. 16, 2017) ("Shepherd II"). The Southern District of New York held that "[p]laintiff has not alleged that he suffered any injury as a result of the ripping/tearing of his dreadlocks that was 'objectively harmful enough to establish a constitutional violation.'" Id. (quoting Hudson, 503 U.S. at 8). Moreover, plaintiff failed to allege that the defendants ripped or tore his dreadlocks with malicious or sadistic intent. See id.

Similarly, plaintiff does not allege that he suffered injury due to the ripping or tearing of his dreadlocks that is objectively sufficiently serious to warrant Eighth Amendment protection. See Hudson, 503 U.S. at 9 (internal citations omitted); Blyden, 186 F.3d at 262. Further, absent plaintiff's conclusory allegations, there is no indication that C.O. Alagrin or C.O. Hoffman maliciously or sadistically ripped and/or tore plaintiff's dreadlocks. See Sims, 230 F.3d at 21-22 ("[T]he malicious use of force to cause harm constitutes an Eighth Amendment violation[ ] per se . . . . whether or not significant injury is evident.") (internal quotation marks omitted) (quoting Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999) (concluding that although the plaintiff only suffered bruising and swelling, a genuine issue of material fact existed as to "what transpired after [the plaintiff] was handcuffed and whether the guards maliciously used force against him."); Sims, 230 F.3d at 21 (finding that the wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"). Absent evidence of such motivation, the undersigned finds that the alleged uses of force during the October 25, 2013; November 9, 2013; and August 2, 2014 pat frisks were de minimis. Accordingly, it is recommended that defendants' motion on this ground be granted.

**b. September 23, 2013; February 10, 2014; and August 2, 2014**
**Incidents of Alleged Sexual Abuse**

In Crawford v. Cuomo, the Second Circuit stated that a single incident of sexual abuse may violate the Eighth Amendment if it is "sufficiently severe or serious." Crawford, 796 F.3d at 257. The Crawford Court explained:

> [t]o show that an incident or series of incidents was serious enough to implicate the Constitution, an inmate need not allege that there was penetration, physical injury, or direct contact with uncovered genitalia. A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment. Similarly, if the situation is reversed and the officer intentionally brings his or her genitalia into contact with the inmate in order to arouse or gratify the officer's sexual desire or humiliate the inmate, a violation is self-evident because there can be no penological justification for such contact.

Id. Ultimately, in assessing whether an Eighth Amendment violation has occurred, "the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." Id. at 257-58 (citing Whitley v. Albers, 475 U.S. 312, 320 (1986) (determining that an Eighth Amendment inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.")).

As to the September 23, 2013 incident with C.O. Strang and February 10, 2014 incident with C.O. Zibler, the undersigned finds that a genuine issues of material fact exist as to whether C.O. Strang and C.O. Zibler intended to humiliate plaintiff or act for his own sexual gratification. See Crawford, 796 F.3d at 257. Plaintiff contends that, while C.O. Strang squeezed and grabbed his genitalia, he stated that "should fuck [plaintiff] in the ass," and threatened to "physically[ ] and sexually assault [him] by penetrating [his] anal hole." Am. Compl. ¶ 9. Plaintiff further claims that while C.O. Zibler squeezed and grabbed his genitalia, he "threatened to finger fuck him." Id. ¶ 29.

64

Although C.O. Strang and C.O. Zibler's alleged conduct took place during a pat frisk, which, if properly conducted, serves a valid penological purpose, the nature of their alleged actions, combined with their sexual commentary, suggests that C.O. Strang and C.O. Zibler intended to humiliate plaintiff or act for their own sexual gratification. See Shepherd II, 2017 WL 666213, at *18 ("Even if each pat frisk, if properly conducted, could have served a valid penological objective, the alleged aggressive squeezing and fondling of Plaintiff's genitalia, combined with the accompanying threats of sexual violence or retaliation, would allow a reasonable factfinder to find that the corrections officers lacked a penological purpose and intended to sexually gratify themselves, to humiliate Shepherd, or both."); Shannon v. Venettozzi, 670 F. App'x 29, 31 (2d Cir. 2016) (summary order) ("These [sexually-explicit] statements, in conjunction with Shannon's description of the forcefulness of some of the pat-downs, were sufficient to plausibly allege that Officer McTurner conducted the pat-downs either 'to gratify [his] sexual desire or to humiliate' Shannon, neither of which is a permissible motivation, rather than for any legitimate penological purpose."); Allah v. Morrison, No. 14-CV-6735, 2016 WL 4017340, at *3-4 (W.D.N.Y. July 22, 2016) ("[The defendant's] alleged taunts to [the plaintiff], including the statements, 'you know what I want' and 'give me what I want and you'll get what you want', suggest that [the defendant's] conduct was designed to humiliate [the plaintiff], gratify herself, or both."); see also Crawford, 796 F.3d at 259 ("[The defendant's] demeaning comments, including the statements '[t]hat doesn't feel like a penis to me,' [and] 'I'll run my hands up the crack of your ass if I want to' . . . suggest that [the defendant] undertook the search in order to arouse himself, humiliate [the plaintiff], or both."). Therefore, because a reasonable fact finder could conclude that C.O. Strang and C.O. Zibler intentionally touched plaintiff in a sexual manner, and with an intention to humiliate plaintiff and/or sexually gratify themselves, it is recommended that defendants' motion, insofar as it relates to sexual assault claims against C.O. Strang and C.O. Zibler, be denied.

However, there is no indication that C.O. Hoffman made sexually-explicit statements during the pat

frisk.    Plaintiff indicates that C.O. Hoffman asked him if he "ha[d] something to say to him," but that comment does not suggest that C.O. Hoffman undertook the search to sexually arouse himself or humiliate plaintiff.  See Am. Compl. ¶ 33.  Moreover, as defendants allege, the pat frisk occurred after plaintiff returned from recreation, which was routine for all keeplocked inmates after recreation.  See Def. Mem. of Law at 5 n.1; DOCCS Dir. 4910(III)(B)(2)(b)(2), Dkt. No. 107-7 at 4 ("A pat frisk may be made of inmates enroute to and from program and recreation areas.").  Such pat frisks relate to the safety and security of the facility and ensure that inmates do not bring contraband into the recreation yard or back into the facility.  See id. Pursuant to Directive 4910, "[c]ontact through the clothing with the genitalia . . . and buttocks is a necessary component of a thorough pat frisk.  However, staff must avoid any penetration of the anal or genital opening through the clothing during a pat frisk."  Dkt. No. 107-7 at 4.  Although plaintiff contends that C.O. Hoffman "appl[ied] pressure" to his anal opening, there is no indication that he intentionally penetrated plaintiff's anus.  See Am. Compl. ¶ 33.  Thus, the undersigned finds that C.O. Hoffman's alleged contact with plaintiff's genitalia was incidental to a routine pat frisk, see Crawford, 796 F.3d at 257, and it is recommended that defendants' motion, insofar as it relates to retaliation claims against C.O. Hoffman, be granted.

### i. Qualified Immunity

Here, C.O. Strang and C.O. Zibler are not protected by qualified immunity "because the sexual assault of a prison inmate is outside the scope of a corrections officer's official duties."  Rodriguez v. McClenning, 399 F. Supp. 2d 228, 238 (S.D.N.Y. 2005).  Both Crawford and its predecessor Boddie v. Schneider criminalize a corrections officer's sexual conduct against an inmate.  See id.; Crawford, 796 F.3d at 259; Boddie v. Schneider, 105 F.3d 857, 861 (2d Cir. 1997).  Moreover, New York State has enacted a zero tolerance approach, criminalizing sexual assault in the prison setting.  See N.Y. Penal L. §§ 130.05(3)(e), 130.52 (2018); see also Shepherd II, 2017 WL 666213, at *23 ("[T]he fact that the alleged [physical] conduct

66

constituted a crime under New York State law, and was the subject of national legislation aimed at stopping

such conduct in prisons, reinforces the conclusion that every reasonable officer would have known it violated

the Eighth Amendment.").  Given the state of the law, it was not objectively reasonable for C.O. Zibler or

C.O. Strang to have believed forcibly touching an inmate's genitals while making sexually suggestive and

expletive statements and/or threats was within the scope of their duties as corrections officers.  See Am.

Compl. ¶¶ 9, 29.  Thus, as qualified immunity cannot protect C.O. Strang and C.O. Zibler, it is recommended

that defendants' motion on this ground be denied.


### 3. Failure to Intervene

Plaintiff contends that C.O. Phillips "condoned [C.O. Hoffman] sexually molesting/assaulting [him]

. . . [, and] fail[ed] to refrain and/or restrain his fellow officer from violating [his] rights."  Am. Compl. at

25.  The failure of corrections officers to employ reasonable measures to protect an inmate from violence by

others may rise to the level of an Eighth Amendment violation.  See Ayers v. Coughlin, 780 F.2d 205, 209

(2d Cir. 1985).

> In order to establish liability on the part of a defendant under a failure to
> intervene theory, a plaintiff must prove the use of excessive force by
> someone other than the individual and that the defendant under
> consideration: (1) possessed actual knowledge of the use by another
> corrections officer of excessive force; (2) had a realistic opportunity to
> intervene and prevent the harm from occurring; and (3) nonetheless
> disregarded that risk by intentionally refusing or failing to take reasonable
> measures to end the use of excessive force.

Lewis v. Mollette, 752 F. Supp. 2d 233, 244 (N.D.N.Y. 2010) (internal citation and quotation marks omitted).

In recommending defendants' motion be granted insofar as it relates to plaintiff's claim of excessive

force and sexual assault against C.O. Hoffman, there is no basis for plaintiff's claim against C.O. Phillips

for failure to intervene to protect plaintiff from C.O. Hoffman because the undersigned has recommended

plaintiff's underlying excessive force and sexual assault claim against him be dismissed.  Accordingly, it is

recommended that defendants' motion on this ground be granted.

#### 4. Deliberate Indifference to Serious Medical Needs

Plaintiff contends that Dr. Lee, C.O. Morgenthaler, and C.O. Zibler were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Am. Compl. 22-24. Specifically, plaintiff contends that (1) C.O. Morgenthaler and C.O. Zibler failed to pick up and process his sick call requests; and (2) Dr. Lee denied him adequate treatment for his back, knee, and leg pain; glaucoma; frequent urination; and delayed his permits for tinted eyeglasses, a knee brace, and a walking cane. Am. Compl. ¶¶ 31, 42-48. "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). The deliberate indifference standard consists of both an objective and subjective component. Hathaway, 37 F.3d at 66. The objective component requires the plaintiff to demonstrate that his alleged medical need is "sufficiently serious." Id. The subjective component requires a showing that the defendant has acted with a "sufficiently culpable state of mind." Id.

As to the objective component, for an inmate to state a cognizable claim of deliberate indifference, he must make a showing of serious illness or injury. See Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003). Deprivation of medical treatment is "sufficiently serious" if the injury or illness is one where there is "a condition of urgency, one that may produce death, degeneration, or extreme pain." Hathaway, 37 F.3d at 66 (internal citation omitted). "Determining whether a deprivation is an objectively serious deprivation entails two inquiries." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006)). First, the Court must determine "whether the prisoner was actually deprived of adequate medical care." Kucharczyk v.

68

Westchester Cnty., 95 F. Supp. 3d 529, 537 (S.D.N.Y. 2015) (citation and internal quotation marks omitted).
"Prison officials are not obligated to provide inmates with whatever care the inmates desire.  Rather, prison
officials fulfill their obligations under the Eighth Amendment when the care provided is reasonable."  Jones
v. Westchester Cnty. Dep't of Corrs., 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008).  However, a prison official
may be held liable "if he knows that inmates face a substantial risk of serious harm and disregards that risk
by failing to take reasonable measures to abate it."  Farmer v. Brennan, 511 U.S. 825, 847 (1994).  Second,
the Court must determine "whether the inadequacy in medical care is sufficiently serious.  This inquiry
requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy
has caused or likely will cause the prisoner."  Id.

> [I]f the unreasonable medical care is a failure to provide any treatment for
> an inmate's medical condition, courts examine whether the inmate's medical
> condition is sufficiently serious. Factors relevant to the seriousness of a
> medical condition include whether a reasonable doctor or patient would
> find [it] important and worthy of comment, whether the condition
> significantly affects an individual's daily activities, and whether it causes
> chronic and substantial pain. In cases where the inadequacy is in the
> medical treatment given, the seriousness inquiry is narrower.  For example,
> if the prisoner is receiving on-going treatment and the offending conduct is
> an unreasonable delay or interruption in that treatment, the seriousness
> inquiry focus[es] on the challenged delay or interruption in treatment rather
> than the prisoner's underlying medical condition alone. Thus, although we
> sometimes speak of a "serious medical condition" as the basis for an Eighth
> Amendment claim, such a condition is only one factor in determining
> whether a deprivation of adequate medical care is sufficiently grave to
> establish constitutional liability.

Salahuddin, 467 F.3d at 280 (internal citation and quotation marks omitted).

As to the subjective component, a prison official acts with a sufficiently-culpable state of mind when
"the official knows of and disregards an excessive risk to inmate health or safety; the official must both be
aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he
must also draw the inference."  Farmer, 511 U.S. at 837.  "Deliberate indifference is a mental state equivalent
to subjective recklessness" which "requires that the charged official act or fail to act while actually aware

of a substantial risk that serious inmate harm will result." Id. (quotation marks omitted). A defendant "may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was 'insubstantial or non-existent.'" Wright v. Genovese, 684 F. Supp. 2d 137, 154 (N.D.N.Y. 2010) (citing Farmer, 511 U.S. at 844)). Therefore, "the defendant's belief that his conduct posed no risk of serious harm need not be sound so long as it is sincere, and even if objectively unreasonable, a defendant's mental state may be nonculpable." Id. at 154-155 (quoting Salahuddin, 467 F.3d at 281) (internal quotation marks omitted).

Further, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim." Chance, 143 F.3d at 703. Therefore, any "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of intervention, are not adequate grounds for a Section 1983 claim." Randle v. Alexander, 960 F. Supp. 2d 457, 481 (S.D.N.Y. 2013) (citation omitted).

The undersigned determines that plaintiff failed to provide evidence from which a fact-finder could reasonably conclude that Dr. Lee, C.O. Morgenthaler, or C.O. Zibler provided plaintiff with inadequate treatment; in fact, the record establishes the opposite.

### a. C.O. Morgenthaler and C.O. Zibler

Plaintiff contends that on June 28, 2014, C.O. Zigler denied his request for emergency medical attention. Am. Compl. ¶ 31. Plaintiff also claims that C.O. Morgenthaler denied him access to medical treatment.[24] Id. at 24. Plaintiff does not elaborate on these claims, and fails to provide evidence that either defendant denied his request for sick call. Moreover, as plaintiff does not indicate the underlying condition

---

[24] Plaintiff does not state when C.O. Morgenthaler denied him access to medical treatment.

70

he requested medical attention for on June 28, 2014 or what type of medical treatment C.O. Morgenthaler denied him, the undersigned is unable to determine whether plaintiff suffered from a medical condition sufficiently serious to warrant Eighth Amendment protection, or if C.O. Zibler or C.O. Morgenthaler knew of and disregarded an excessive risk to plaintiff's health or safety. See Hathaway, 37 F.3d at 66. Thus, it is recommended that defendants' motion on this ground be granted.

### b. Dr. Lee

### i. Urology Medication

Plaintiff contends that Dr. Lee discontinued his urology medication on September 12, 2013. Am. Compl. ¶ 45. Plaintiff claims that he made "numerous request[s]" for the medication's renewal, but Dr. Lee "denied and/or ignored" all requests. Id. Plaintiff's medical records indicate that on August 13, 2013; August 29, 2013; September 1, 2013; September 5, 2013; September 9, 2013; and September 10, 2013, plaintiff refused sick call, and informed officers that he did not want his urology medication. Dkt. No. 108 ("Pl. Medical Records") at 36, 38, 39, 40, 41. Dr. Lee declares that he discontinued plaintiff's urology prescription "because of his repeated refusals to take the medication." Dkt. No. 109-12 ("Lee Decl.") ¶ 19. On September 17, 2013, plaintiff complained of nighttime urination, and, on that same day, Dr. Lee reordered the prescription. Id. ¶ 20; Pl. Medical Records at 42. On September 20, 2013, plaintiff refused sick call for distribution of his medicine. Lee Decl. ¶ 21; Pl. Medical Records at 42.

The undersigned finds that plaintiff has not demonstrated that Dr. Lee deprived him of adequate medical care with regard to his urology medication. Dr. Lee's statements that he discontinued plaintiff's medication only after he "repeated[ly] refused to take the medication" are consistent with the plaintiff's medical records, which establish that plaintiff refused to leave his cell on at least six occasions, and affirmatively stated, "I don't want [the medication]." Pl. Medical Records at 36, 38, 39, 40, 41. Moreover,

71

the medical records establish that when plaintiff requested the medication on September 17, 2013, Dr. Lee promptly renewed his prescription that day. Lee Decl. ¶ 20; Pl. Medical Records at 42. Insofar as plaintiff suggests that he needed a wheelchair to attend sick call, his medical records note that "he has been walking to medical when he comes for [his medication] and his permit expired in August 21, 2013." Pl. Medical Records at 40. Moreover, Dr. Lee later determined that plaintiff did not need a wheelchair to assist in ambulance. Lee Decl. ¶ 14. Thus, plaintiff has failed to establish that Dr. Lee deprived him of adequate medical care with regard to his urology medication.

Even assuming plaintiff had demonstrated a deprivation of medical care, there is no indication that Dr. Lee knew of and disregarded an "excessive risk" to his health under the subjective prong of the test. Farmer, 511 U.S. at 837. The record establishes that Dr. Lee promptly reordered plaintiff's urology medication on the same day that he requested. Lee Decl. ¶ 20; Pl. Medical Records at 42. To the extent that plaintiff argues that he sent "numerous request[s]" to Dr. Lee for renewal of the medication, plaintiff only proffers a letter dated December 4, 2013 and addressed to the Facility Health Service Director[25] in which he contends that his "treatment [for frequent night urination] was stopped with no [explanation] and [he] continue[s] to have frequent urination at night[,] and [his] complaints have been ignored[.]" Dkt. No. 113-7 at 124. However, plaintiff does not proffer evidence that Dr. Lee received the December 4, 2013 letter, had actual knowledge that plaintiff was not receiving urology medication in December 2013, and did not make an effort to remedy the condition. See Braham v. Perelmuter, No. 3:15-CV-1094 (JCH), 2017 WL 3222532, at *13 (D. Conn. July 28, 2017) ("Once the defendant moves for summary judgment, however, a plaintiff must provide evidence to support his claim that the defendant in fact received the letter, had actual knowledge of the risk of harm or unconstitutional conditions, and failed to make any effort to remedy the conditions or

---

[25] Plaintiff refers to Dr. Lee as the Facility Health Services Director in other correspondence, but Dr. Lee does not declare that he held that title, nor is there any other indication in the record that Dr. Lee served as the Facility Health Services Director.

to prevent or protect the plaintiff from the harm.") (citing <u>Farmer</u>, 511 U.S. at 836-37).  Moreover, it is well-settled that "[a]n inmate's refusal to receive treatment indicates that the inmate's treating doctors and nurses were not deliberately indifferent to the inmate's medical needs."  <u>Nelson v. Deming</u>, 140 F. Supp. 3d 248, 261 (W.D.N.Y. 2015) (citing <u>Jones v. Smith</u>, 784 F.2d 149, 152 (2d Cir. 1986)).  Thus, plaintiff has failed to raise a material question of fact whether Dr. Lee knew of and disregarded an excessive risk to his health or safety.  <u>See</u> <u>Farmer</u>, 511 U.S. 837.  Accordingly, it is recommended that defendants' motion, insofar as it relates to plaintiff's urology medication and the necessity of his wheelchair, be granted.

### ii. Asthma

Plaintiff contends that he informed Dr. Lee that the lack of ventilation and air circulation in his cell aggravated his asthma, causing difficulty breathing, tightness in his throat, shortness of breath, and pain in his chest.  Am. Compl. ¶ 48.  Plaintiff claims that Dr. Lee "did nothing" to treat his asthma.  <u>Id.</u>  Plaintiff's medical records seem to suggest that a medical provider diagnosed plaintiff with "mild persistent" asthma on August 19, 2013, and instructed him on inhaler use to treat his symptoms.  Pl. Medical Records at 37.[26]  On November 18, 2013, plaintiff complained of "breathing complications [ ] dust, asthma."  Pl. Medical Records at 46.  An "Asthma Interim Visit" was conducted on June 9, 2014, and Dr. Lee noted that plaintiff suffered from "Mild Intermittent Asthma," and that his condition was stable with no change in symptoms.  Lee Decl. ¶ 34; Pl. Medical Records at 21.  Dr. Lee advised plaintiff to "continue using his inhaler as needed."  Lee Decl. ¶ 34.

This Court has held previously that an asthma condition, absent a substantial asthma attack, does not constitute a serious medical condition.  <u>See</u> <u>Bost v. Bockelmann</u>, No. 9:04-CV-0246 (GLS/DEP), 2007 WL 527320, at *8-9 (N.D.N.Y. Feb. 20, 2007) (citing cases for the proposition that being asthmatic — a person

---

[26] Dr. Lee does not indicate that he participated in this Asthma visit, and the provider's signature is illegible.  <u>See</u> Pl. Medical Records at 37.

susceptible to asthma attacks — is not a sufficiently serious condition, which is distinct from the situation in which an inmate is suffering an actual attack).  Courts have also held that "[a]lthough an asthma condition alone may not be serious enough to constitute a sufficient medical condition, an asthma attack, depending on its severity, may be sufficient."  Carlisle v. Goord, No. 9:03-CV-296 (FJS/GHL), 2007 WL 2769566, at *4 (N.D.N.Y. Sept. 21, 2007); cf. Scott v. DelSignore, No. 02-CV-029 (LGF), 2005 WL 425473, at *9 (W.D.N.Y. Feb. 18, 2005) (stating that active asthma symptoms may support an Eighth Amendment claim).

Plaintiff does not contend that he suffered an asthma attack due to the alleged poor ventilation and air circulation in his cell.  Moreover, it is clear that in relation to the June 9, 2014 asthma visit, Dr. Lee advised plaintiff to  "continue using his inhaler as needed."  Lee Decl. ¶ 34.  Plaintiff does not allege, and there is no indication in the record, that Dr. Lee discontinued plaintiff's prescription for his inhaler, or otherwise prevented plaintiff's use of the inhaler.  Thus, plaintiff has failed to establish that Dr. Lee deprived him of adequate medical care with regard to his asthma.

Even if the undersigned concluded that plaintiff had demonstrated a deprivation of medical care, there is no indication that Dr. Lee knew of and disregarded an "excessive risk" to his health under the subjective prong of the test.  Farmer, 511 U.S. at 837.  Plaintiff proffers a letter dated November 1, 2013, in which he alleges that  "there is no [ventilation] in my cell, no air circulation [ ] with all the windows being closed," and that these conditions aggravated his asthma.  Dkt. No. 113-7 at 123.  However, plaintiff fails to demonstrate that Dr. Lee received the November 1, 2013 letter, had actual knowledge that suffered from wheezing and tightness in his chest.  See Braham, 2017 WL 3222532, at *13.  Even assuming Dr. Lee's receipt of the November 2013 letter, the record does not support a conclusion that Dr. Lee intentionally delayed treatment for plaintiff's asthma, nor is there any evidence supporting a conclusion that treatment was delayed as a form of punishment.  See Crique v. Magill, No. 12 Civ. 3345(PAC)(GWG), 2013 WL 3783735, at *3 (S.D.N.Y. July 9, 2013) (internal citation and quotation marks omitted) ("While delays in providing

74

necessary medical care may in some cases demonstrate deliberate indifference, the Second Circuit has reserved those instances to cases when prison officials deliberately delayed care as a form of punishment."). In fact, the record indicates that plaintiff had use of an inhaler, at least as early as August 2013, to combat his asthma symptoms.  Moreover, there is no indication that Dr. Lee had the authority to remedy plaintiff's complaints regarding his cell ventilation by transferring him to a different cell or direct that the windows be opened.  See Dkt. No. 113-7 at 123.  Dr. Lee declared that "continued use of the inhaler was the only reasonable recommendation a physician could make," and plaintiff's preference for different treatment does not give rise to an Eighth Amendment claim.  See Chance, 143 F.3d at 703.  Thus, plaintiff has failed to demonstrate a material question of fact whether Dr. Lee knew of and disregarded an excessive risk to his health or safety.  See Farmer, 511 U.S. 837.  Accordingly, it is recommended that defendants' motion, insofar as it relates to plaintiff's asthma, be granted.

### iii. Delay of Permits

Plaintiff contends that Dr. Lee denied and/or delayed the renewal of medical permits for (1) his ambulatory devices; (2) his tinted eyeglasses; and (3) standing during his programs because of his inability to sit for long periods.  Am. Compl. ¶¶ 10, 43, 45, 46, 47.  As plaintiff alleges a delay in ongoing treatment, in assessing the seriousness of plaintiff's medical condition, the Court must focus on the challenged delay, rather than the underlying medical condition itself.  See Salahuddin, 467 F.3d at 280.  As to the ambulatory devices, plaintiff's medical records indicate, as to the ambulatory devices, that on July 31, 2013, shortly after he arrived at Shawangunk, plaintiff received a permit for a cane, knee brace, and wheelchair for long distances.  Pl. Medical Records at 68.  The permit expired on August 21, 2013.  Id.  On August 21, 2013, Dr. Lee advised plaintiff to make an appointment prior to September 19, 2013 to reevaluate plaintiff's need for the cane, knee brace, and wheelchair.  Id. at 38; Lee Decl. ¶ 12.  On September 4, 2013, plaintiff received

a permit for tinted eyeglasses. Pl. Medical Records at 68. On September 9, 2013, plaintiff refused to attend sick call to receive his medication, and requested his wheelchair. Id. at 40. The nurse noted that plaintiff "has been walking to medical when he comes for [medication] and his permit expired in [sic] August 21, 2013." Id. On September 10, 2013, Dr. Lee completed plaintiff's reevaluation, and reissued permits for a knee brace and cane from September 17, 2013 through March 17, 2014. Id. at 41, 68. Dr. Lee determined that plaintiff did not require continued use of a wheelchair. Id. at 41.

On March 4 and March 21, 2014, plaintiff requested that his permits for a knee brace, tinted eyeglasses, and cane be renewed. Pl. Medical Records at 12, 14. Plaintiff's records indicate that the "permit[s] [were] written 3/18/14." Id. at 14. On March 21, 2014, medical staff issued plaintiff two copies of the renewed permits. Id. On April 4, 2014, plaintiff informed medical staff that his cane, tinted eyeglasses, and knee brace permits were "no good," as they were not signed "by the captain." Id. Medical staff issued plaintiff a three-day permit for his cane and tinted eyeglasses, and submitted documentation for a long-term permit to plaintiff's medical provider[27] to approve. Id. Medical staff also submitted the permit for plaintiff's knee brace to the medical provider to determine his continued use. Id. On April 11, 2014, Dr. Lee issued plaintiff long-term permits for his tinted eyeglasses, knee brace, and cane. Id. at 15. Plaintiff's permits expired in April 2015. Id. at 69.

On or about May 2, 2014, plaintiff visited the ophthalmology clinic at Coxsackie Correctional Facility. Pl. Medical Records at 17. On May 5, 2014, plaintiff met with Dr. Lee, who referred him to an optometrist concerning his tinted glasses. Id. at 18; Lee Decl. ¶ 32. On May 9, 2014, plaintiff's medical records show that he had seen the optometrist, and new, darker tinted eyeglasses had been ordered. Id. at 18. On August 8, 2014, plaintiff inquired as to the status of his new tinted eyeglasses. Id. at 27. Plaintiff transferred out of Shawangunk on or about August 21, 2014. Id. at 31.

_____

[27] It is unclear if this refers to Dr. Lee.

Plaintiff argues that the approximately one-month delay in renewing his tinted eyeglass permit aggravated his glaucoma, and caused pain and discomfort in his eyes, as well as blurred vision, migraine headaches, and elevated eye pressure. Am. Compl. ¶ 46. Plaintiff also argues that approximately one month-delay in renewing his knee brace and cane permits caused him to "constantly fall, experiencing great pain and discomfort, [and] severe swelling." Id. The Second Circuit has held that "[n]ot every lapse in medical care is a constitutional wrong." Salahuddin, 467 F.3d at 279. "Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, this [Circuit] has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast-degenerating condition for three days; or delayed major surgery for over two years." Demata v. New York State Corr. Dept. of Health Servs., 198 F.3d 233, 1999 WL 753142, at *2 (2d Cir. Sept.17, 1999) (Table) (internal citations and quotation marks omitted). Plaintiff's claims of eye pain and discomfort, sporadic falling, blurred vision, migraines, and elevated eye pressure are not "life-threatening" or "fast-degenerating." See id. Moreover, the undersigned finds that plaintiff has failed to demonstrate that the approximately one-month delay in permit renewals caused him any objectively serious harm other than conclusory allegations of "pain and discomfort." See Smith, 316 F.3d at 188-89 ("Although [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the [deprivation itself] . . . resulted in permanent or on-going harm to his health . . . .").

Even if the undersigned determined that the delay in permit renewal seriously aggravated plaintiff's glaucoma, see Richardson v. Nassau Cnty., 277 F. Supp. 2d 196, 202 (E.D.N.Y. 2003) ("The Second Circuit has found deliberate indifference as a result of a medical official's failure to treat an eye condition."), absent plaintiff's conclusory allegations that Dr. Lee "did not like [him] because [he] wrote grievances," Am. Compl. ¶ 45, there is no indication in the record that Dr. Lee orchestrated these delays to punish plaintiff. Further, the length of the delays — approximately one month — "is far from 'egregious.'" Ramos v. New

York State, No. 9:17-CV-337 (LEK/TWD), 2017 WL 4326521, at *3 (N.D.N.Y. Sept. 28, 2017) (citing cases for the proposition that a ten-week delay and a two-month delay are insufficient periods of time to amount to deliberate indifference); cf. Hathaway v. Coughlin, 841 F.2d 48, 50 (2d Cir. 1988) (concluding that a delay of over two years between the injury and the surgery constitutes deliberate indifference). Thus, plaintiff has failed to establish that the delay in permit renewal constitutes a sufficiently serious deprivation.

Assuming that plaintiff had a sufficiently serious deprivation of medical needs that satisfied the objective component and warranted protection under the Eighth Amendment, plaintiff has not demonstrated that Dr. Lee acted with a "sufficiently culpable state of mind." Hathaway, 37 F.3d at 66. "There were no appreciable gaps in the treatment of [p]laintiff and [p]laintiff has failed to show that [Dr. Lee] evinced a conscious disregard of a substantial risk of serious harm." Lighthall v. Vadlamudi, No. 9:04-CV-0721, 2006 WL 721568, at *12 (N.D.N.Y. Mar. 17, 2006). Plaintiff proffers letters to Dr. Lee dated August 16, 2013; April 18, 2014; July 8, 2014; and August 4, 2014, in which he details his alleged pain and discomfort. Dkt. No. 113-7 at 122, 125, 126, 128. However, plaintiff only mentions the permit delay as the cause of his symptoms in the April 18, 2014 letter, and attributes those symptoms in the other letters to "sit[ting] in[ ] front of a computer for a couple hours." Id. at 125 ("Even when I wore my tinted glasses to class, they did not help protect my eyes from the computer screen, for I experienced pain and discomfort to my eyes as well as double blurry vision.").

Moreover, plaintiff fails to demonstrate that Dr. Lee received the August 16, 2013; April 18, 2014; July 8, 2014; or August 4, 2014 letters, had actual knowledge that suffered from pain and discomfort in his eyes and legs, and did not make an effort to remedy the condition. See Braham, 2017 WL 3222532, at *13. Even assuming Dr. Lee's receipt of plaintiff's letters, the record does not support a conclusion that Dr. Lee intentionally delayed renewal of the knee brace, cane, or tinted eyeglass permit.    Even if Dr. Lee's delay

caused plaintiff unintended harm, negligence[28] is not actionable under section 1983.  See Burroughs v. Petrone, 138 F. Supp. 3d 182, 211 (N.D.N.Y. 2015) ("Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm.") (internal quotation marks and citation omitted); see also Daniels v. Williams, 474 U.S. 327 (1986) (concluding that negligence is not a cognizable claim under section 1983); Kucharczyk, 95 F. Supp. 3d at 537 ("[M]ere negligence is not enough to state a claim for deliberate indifference.").  Thus, plaintiff has not demonstrated the existence of a material question of fact whether Dr. Lee knew of and disregarded an excessive risk to his health or safety.  See Farmer, 511 U.S. 837.  Accordingly, it is recommended that defendants' motion, insofar as it relates to Dr. Lee's delay of permit renewals for his cane, knee brace, and tinted eyeglasses, be granted.

Insofar as plaintiff alleges that Dr. Lee denied him a permit allowing him to stand during programs, plaintiff fails to demonstrate that he was deprived of adequate medical care based on Dr. Lee's alleged denial of the permit.  Plaintiff does not indicate when he requested, and Dr. Lee subsequently denied, a permit for intermittent standing.   Aside from his conclusory allegations that he suffered "extreme lower back pain," plaintiff does not assert "urgency of his need for treatment, or the ways in which his condition affected his ability to go about his daily activities."   Smith v. Wilson, No. 9:12-CV-01152 (MAD/RFT), 2013 WL 5466857, at * 8 (N.D.N.Y. Sept. 30, 2013) (citing Chance, 143 F.3d at 702)).  Moreover, Dr. Lee has "no recollection of any request for a permit allowing him to stand during programs."  Lee Decl. ¶ 24.  As plaintiff does not indicate when Dr. Lee allegedly denied the permit request, the undersigned is unable to determine the length of the delay in treatment.  Even assuming that Dr. Lee denied plaintiff's request for an intermittent standing permit, plaintiff's medical records demonstrate that on May 15, 2014, he requested a "permit for intermittent standing," and that the "permit [was] issued/signed by MD for intermittent standing."  Pl. Medical Records at 19.  Further, to the extent that Dr. Lee's alleged denial of plaintiff's permit for

_____

[28] The undersigned makes no assessment as to whether plaintiff can state a claim as to negligence, a state-law claim not properly before this Court.

intermittent standing differed from the opinion of another non-party medical provider, this allegation does not amount to a constitutional violation. See Chance, 143 F.3d at 703 ("[M]ere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim.") (internal citation omitted); Lighthall, 2006 WL 721568, at *10 ("There will be no Eighth Amendment claim then when a doctor disagrees with the professional judgment of another doctor.") (internal quotation marks and citation omitted). Accordingly, insofar as plaintiff claims that Dr. Lee denied him a permit for intermittent standing, it is recommended that defendants' motion on this ground be granted.

As to plaintiff's allegation that Dr. Lee denied him a permit to partially cover his cell with a sheet to treat his "shy bladder" syndrome, plaintiff fails to demonstrate that he was deprived of adequate medical care. Plaintiff's allegation that he was unable to urinate in front of other inmates, which resulted in "soil[ing] [himself]" at night, Am. Compl. ¶ 47, "fall far short of establishing the existence of a condition of urgency, capable of producing death, degeneration or extreme pain." Dabney v. Maddock, No. 9:10-CV-0519 (GTS/DEP), 2011 WL 7479164, at *7 (N.D.N.Y. Nov. 29, 2011) (citing cases).

However, assuming that plaintiff's condition constituted a sufficiently seriously medical condition warranting Eighth Amendment protection, plaintiff's medical records show that on June 23, 2014, plaintiff informed a non-party nurse that he "needs permission for curtain [to cover his cell] per Supt." Pl. Medical Records at 22. The nurse advised plaintiff that he had an upcoming appointment on July 17, and noted, "to MD re: curtain for toilet use (states shy bladder)." Id. On June 24, 2014, plaintiff's medical records note that "shy bladder form was filled out and sent to security . . . NA D. Kaval on 9/6/13. Per Lt. Gardner it is up to officers if they want to allow partial privacy while using toilet." Id. The nurse advised plaintiff that he had an upcoming medical appointment on July 17. Id. at 22, 40. The July 17, 2014 notes, however, do not mention a permit to partially cover plaintiff's cell, or issues regarding a shy bladder, and defendants do

80

not address plaintiff's claim.  See id. at 25.  Further, the record suggests that allowing a curtain in an inmate's cell would be the decision of the corrections officers, not the medical providers.  See id. at 22.  Thus, the undersigned finds that even if Dr. Lee denied plaintiff's permit request for a partial cell covering, there is no indication in the record that he did so with a "sufficiently culpable state of mind."  Hathaway, 37 F.3d at 66.  As plaintiff has failed to demonstrate both prongs of the deliberate indifference analysis, it is recommended that defendants' motion on this ground be granted.

### iv. Chronic Pain

Plaintiff contends that Dr. Lee failed to treat chronic pain in his lower back, legs, and shoulders.  Am. Compl. ¶ 48.  The undersigned disagrees; in fact, the record establishes that Dr. Lee provided plaintiff adequate medical treatment.  See Kucharczyk, 95 F. Supp. 3d at 537.  Plaintiff's medical records indicate that, beginning in September 2013, he attended physical therapy three times a week for four weeks to treat his lower back pain.  See Pl. Medical Records at 73, 75, 76, 80, 81, 82, 83, 84, 85, 86, 87.  Plaintiff continued to complain of lower back pain, and, in February 2014, Dr. Lee referred plaintiff for a lumbar spine MRI.  Id. at 52-53; Lee Decl. ¶ 39.  In response to the April 25, 2014 MRI results, Dr. Lee referred plaintiff for an orthopedic consultation with an outsider provider.  Pl. Medical Records at 57; Lee Decl. ¶ 40.  Plaintiff attended a follow-up orthopedic appointment on June 27, 2014.  Pl. Medical Records at 56; Lee Decl. ¶ 40.  The outside provider recommended that plaintiff be issued a lumbarsacral (L-S) corset, as well as continued use of a cane and analgesics, to treat plaintiff's pain symptoms.  Id.  Plaintiff received the L-S corset on June 25, 2014.  Pl. Medical Records at 55.

Dr. Lee's declaration that he "provided [p]laintiff with appropriate and timely attention to his medical needs" is consistent with plaintiff's medical records, which establish that plaintiff's complaints of chronic pain were met with referrals for physical therapy, outside providers, and MRIs, as necessary.  See supra.  To

the extent that plaintiff believed he deserved different treatment, such concerns constitute nothing more than disagreement with Dr. Lee's treatment plan, and are not actionable under the Eighth Amendment. <u>See</u> <u>Randle</u>, 960 F. Supp. 2d at 481 (quoting <u>Alston v. Bendheim</u>, 672 F. Supp. 2d 378, 385 (S.D.N.Y. 2009)) ("Indeed, '[a]n inmate's disagreement with his treatment or a difference of opinion over the type or course of treatment [does] not support a claim of cruel and unusual punishment.'"). Moreover, insofar as plaintiff contends that the physical therapist recommended an MRI, and Dr. Lee failed to refer him for the testing, <u>see</u> Am. Compl. ¶ 45, there is no indication in the record that the physical therapist suggested that plaintiff undergo an MRI. <u>See</u> Pl. Medical Records at 73, 75, 76, 80, 81, 82, 83, 84, 85, 86, 87. To the extent that the physical therapist did make a referral, and Dr. Lee believed that the MRI was not needed, such disagreement does not amount to an Eighth Amendment violation. <u>See</u> <u>Lighthall</u>, 2006 WL 721568, at *10. Therefore, as plaintiff has failed to establish that he suffered a sufficiently-serious deprivation of medical care under the objective prong of the deliberate indifference analysis, it is recommended that defendants' motion on this ground be granted.

### E. Fourteenth Amendment

Plaintiff contends that defendants violated his Fourteenth Amendment rights by (1) depriving him of due process; and (2) failing to provide him equal protection under the law. Am. Compl. at 23, 26.

### 1. Due Process

Plaintiff claims that Lt. Gardner and Lt. Palen "knowingly and deliberately used the disciplinary mechanism and procedure [to violate his] due process rights by denying [plaintiff his] right to attend the disciplinary hearing, illegally confining [him]." Am. Compl. at 23. Defendants argue that the standards set forth in <u>Wolff v. McDonnell</u> have been met, and plaintiff's claim must be dismissed. Def. Mem. of Law at

9-10.  The Due Process Clause of the Fourteenth Amendment states: "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. CONST. amend. XIV § 1.  To set forth a prima facie due process claim, "a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process."  Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001) (citation and quotation marks omitted); see Mitchell v. Keane, 974 F. Supp. 332, 342 (S.D.N.Y. 1997) ("To state a procedural due process claim challenging a disciplinary action, a prisoner must allege *both* that he was deprived of a liberty interest cognizable under the Due Process Clause, and that he was deprived of that interest without the requisite [procedural due] process.") (emphasis added).

### a. Liberty Interest

An inmate has a protected liberty interest in being free from segregated confinement but only where the alleged deprivation imposed amounts to an "atypical and significant hardship in relation to the ordinary incidents of prison life."  Sandin v. Connor, 515 U.S. 472, 483-84 (1995).  "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.'"  Davis v. Barrett, 576 F.3d 129, 133 (2d Cir. 2009) (quoting Sandin, 515 U.S. at 484); see Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999) (quoting Sandin, 515 U.S. at 486) ("Although there is no bright-line rule regarding the length or type of sanction that would give rise to an 'atypical and significant hardship,' this standard will not be met unless the disciplinary and administrative sanctions are onerous.").  As defendants do not challenge whether plaintiff retained a liberty interest during his time in keeplock, the undersigned assumes for the purposes of this assessment that plaintiff's approximately 147 days in keeplock confinement implicates a liberty interest.

### b. Procedural Due Process

Although inmates retain their constitutional right to due process protections, "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the fully panoply of rights due a defendant in such proceedings does not apply." Wolff, 418 U.S. at 556; see also Arce v. Walker, 139 F.3d 329, 335 (2d Cir. 1998) (holding that an inmate is entitled to minimal due process protections when being involuntary placed in administrative confinement).

> Certain due process protections therefore apply where disciplinary proceedings may lead to the loss of good time credit or would subject an inmate to solitary confinement in the SHU. Inmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken.

Luna v. Pico, 356 F.3d 481, 487 (2d Cir. 2004) (citation omitted). Plaintiff does not allege that defendants failed to provide him with advance written notice or a written statement of the disposition. Instead, plaintiff challenges his right to attend the hearing and present witnesses and evidence, and his right to a fair and impartial hearing officer. See Am. Compl. at 23.

### i. Waiver of Appearance

As a preliminary matter, plaintiff contends Lt. Gardner and Lt. Palen prevented him from attending disciplinary hearings on September 4, 2013; September 5, 2013; September 12, 2013; November 27, 2013; and June 25, 2014, respectively. Am. Compl. ¶¶ 11-13, 24, 28; Dkt. No. 107-1 ¶¶ 71, 72. New York State regulations mandate that an inmate attend a hearing "'unless he or she refuses to attend, or is excluded for reasons of institutional safety or correctional goals.'" Tafari v. McCarthy, 714 F. Supp. 2d 317, 379-80 (N.D.N.Y. 2010) (quoting 7 N.Y.C.R.R. § 254.6(a)(2) (2010)).

> Under ordinary circumstances, when an inmate voluntarily waives his appearance before a disciplinary hearing officer, he cannot then attack the

> adjudication as violative of his constitutional rights.  An inmate's refusal
> to attend a disciplinary hearing waives his due process objections . . . only
> when it occurs "through no fault of prison officials."

Id. at 380 (quoting Howard v. Wilkerson, 768 F. Supp. 1002, 1006 (S.D.N.Y. 1991) (citations omitted)).  In

Tafari, this Court assessed the evidence in the record, including the defendant hearing officer's written

disposition indicating that plaintiff "refused to attend," the plaintiff's refusal to sign the "Inmate Refusal to

Attend Hearing" form that was witnessed by two corrections officers, and the lack of evidence that plaintiff

refused to appear "through [the] fault of prison officials," and recommended that the "[p]laintiff's claim that

his absence from the hearing violated his right to due process" be dismissed.  Id. at 380.  Similarly, Lt.

Gardner and Lt. Palen's written dispositions from the September 4, September 5, and September 12, 2013,

and November 27, 2013 and June 25, 2014 hearings indicate that plaintiff refused to attend the hearing.  See

Gardner Decl. at 34, 48, 63; Dkt. No. 109-16 ("Palen Decl.") at 10, 45, 69.  Further, plaintiff's refusal to sign

the "Waiver of Right to Attend Disciplinary Hearing" form was witnessed by at least two non-party

corrections officers.  See Gardner Decl. at 36, 51, 67; Palen Decl. at 37, 47.  Additionally, there is no

indication that plaintiff refused to appear through the fault of Lt. Gardner or Lt. Palen as both defendants

stated on-the-record that plaintiff refused to attend the entirety or the remainder of the hearing.  See Gardner

Decl. at 40 (transcribing the September 4, 2013 hearing: "Inmate Shepherd has refused to attend this

hearing[.] [H]e has refused to sign a . . . form and that was witnessed by Officer Phillips and Baker."), 55

(transcribing the September 5, 2013 hearing: "Inmate Shepherd has refused to attend this hearing, he has

refused to sign a refusal waiver form that is dated 9/5/13 and was witnessed by Officer Phillips and Officer

. . . ."), 69 (transcribing the September 12, 2013 hearing: "Inmate Shepherd has refused to attend this hearing

and has also refused to sign a waiver form dated 9/12/13 and has been witnessed by Officer Phillips and

Officer [ ]."); Palen Decl. at 18 (transcribing the November 27, 2013 hearing: "Inmate Shepherd refused to

attend the remainder of this Tier II hearing.  Officer[s] Phillip and Langendorf went to his cell.  Inmate

Shepherd [ ] was informed that [ ] if he waives his right to attend the disciplinary hearing, that a disposition of the charges shall be made in his absence . . . . Inmate Shepherd refused to sign the form."), 60 ("[I]nmate Shepherd has made the decision not to attend the remainder of the disciplinary hearing.").

Moreover, with respect to Lt. Palen's November 27, 2013 disciplinary hearing, the transcript clearly states that plaintiff "decline[d]" to be in the hearing room when certain corrections officers testified. See Palen Decl. at 16. Lt. Palen also made clear that "plaintiff "indicated that he made, was making the decision without any coercion from staff or inmates . . . ." Id. at 60. Therefore, the record is clear that plaintiff waived his due process objections when he refused to attend his disciplinary hearings.

### ii. Reasonable Opportunity to Call Witnesses and Present Documentary Evidence

An inmate is entitled to a reasonable opportunity to call witnesses and present documentary evidence at a hearing. Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004). However, "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] . . . on the basis of irrelevance or lack of necessity." Scott v. Kelly, 962 F.2d 145, 146-47 (2d Cir. 1992) (internal quotation marks and citations omitted); see also Richardson v. Van Dusen, 833 F. Supp. 146, 152 (N.D.N.Y. 1993). Further, "[w]hile inmates do have the right to question witnesses at their disciplinary hearings, that right is not unlimited and its contours are under the discretion of prison officials." Rivera v. Wohlrab, 232 F. Supp. 2d 117, 125 (S.D.N.Y. 2002).

Here, the transcripts of the November 27, 2013 and June 25, 2014 hearings demonstrate that plaintiff was presented with the opportunity to call witnesses on behalf, and those witnesses testified. See Palen Decl. at 18-23 (detailing the testimony of three inmate witnesses that plaintiff requested at the November 27, 2013 hearing), 55-57 (detailing the testimony of an inmate witness that plaintiff requested at the June 25, 2014 hearing). Insofar as plaintiff requested that his urologist and an outside investigator be called as witnesses

86

at the June 25, 2014 hearing, Lt. Palen determined that they were not relevant, and, as to the outside investigator, he had "no first hand knowledge of the incident which initiated this [T]ier 2 hearing." Id. at 65. As to Lt. Gardner's September 4, September 5, and September 12, 2013 disciplinary hearings, plaintiff's refusal to attend the hearing acted as a waiver of his due process right to call witnesses. See Dawes v. Carpenter, 899 F. Supp 892, 897 (N.D.N.Y. 1995). Further, the hearing transcripts demonstrate that plaintiff stated that he "didn't have any witnesses that he wanted to call on his behalf" when corrections officers went to his cell. See Gardner Decl. at 40 (September 4, 2013 hearing), 56 (September 5, 2013 hearing), 69 (September 12, 2013 hearing).

Moreover, the hearing transcripts demonstrate that plaintiff submitted documentary evidence, including sworn affidavits and a copy of his grievances, at the disciplinary hearings he partially attended, see Palen Decl. at 16 (detailing conversation regarding plaintiff's submission of documentary evidence, 53 ("This is my documentary evidence I am going to submit . . . ."), and provided a written statement that Lt. Gardner read into the record when he refused to attend, see Gardner Decl. at 40 (September 4, 2013 hearing), 55-56 (September 5, 2013 hearing). Thus, plaintiff received a reasonable opportunity to call witnesses and present documentary evidence, and was not denied procedural due process on this ground.

### iii. Fair and Impartial Hearing Officer

An inmate is entitled to a fair and impartial hearing officer to preside over his or her disciplinary hearing. Sira, 380 F.3d at 69. However, "the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally." Francis v. Coughlin, 891 F.2d 43, 46 (2d Cir. 1989). Instead, "due process requires only that the hearing officer not be a 'hazard of arbitrary decisionmaking.'" Espinal v. Goord, 180 F. Supp. 2d 532, 539 (S.D.N.Y. 2002) (quoting Wolff, 418 U.S. at 571). Due process is thereby satisfied so long as there is "some evidence" that substantiates the hearing

officer's decision.  Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455 (1985).

The "some evidence" standard set forth by the Supreme Court of the United States "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is *any evidence* in the record that could support the conclusion reached by the disciplinary board."  Hill, 472 U.S. at 455-56 (emphasis added).

After review of the record, it is clear that Lt. Gardner and Lt. Palen acted as fair and impartial hearing officers.  The hearing transcripts demonstrate that Lt. Gardner and Lt. Palen read a copy of the misbehavior report into the record, and explained to plaintiff his rights and the hearing officer's obligations throughout the proceeding.  See Gardner Decl. at 40-41, 55-57, 69-70; Palen Decl. at 12-35, 49-67.  Moreover, Lt. Gardner and Lt. Palen gave plaintiff ample time to respond to the allegations in the misbehavior report and call appropriate witnesses when plaintiff was in attendance.  Id.  Additionally, the record establishes that Lt. Gardner and Lt. Palen's determination of guilt was based on the "some evidence" standard set forth in Hill, 472 U.S. at 455, as both defendants relied on the reporting officer's misbehavior report; the inmate's written statement, where applicable; and verbal testimony of witnesses, where applicable.  See Gardner Decl. at 33, 47, 63; Palen Decl. at 34-35, 66-67.  Insofar as plaintiff alleges that Lt. Gardner and Lt. Palen referenced plaintiff's grievances off-the-record, Am. Compl. ¶¶ 24, 51, "these conclusory allegations, without more, are insufficient to plausibly suggest that plaintiff was denied due process protections[.]"  Walker v. Johns, No. 9:16-CV-0437 (DNH/DJS), 2016 WL 4508358, at *2 (N.D.N.Y. Aug. 28, 2016).  Thus, plaintiff was afforded fair and impartial hearing officers, and was not denied procedural due process on that basis.

In sum, because plaintiff fails to demonstrate that his procedural due process rights were violated during the disciplinary proceedings, as he received notice of the charges against him, a fair and impartial hearing officer, a reasonable opportunity to call witnesses and present documentary evidence, and a written statement of the disposition, he has failed to demonstrate that he was denied procedural due process.

Accordingly, it is recommended that defendants' motion on this ground be granted.

## 2. Equal Protection

Plaintiff contends that Supt. Smith and DSS Andrews "discriminated against [his] religion by failing to implement Rastafarian weekly worshipping [sic] services, while allowing other religious groups to access weekly religious worshipping [sic] services, in violation of equal protection law." Am. Compl. at 26. Defendants argue that Supt. Smith and DSS Andrews were not personally involved in the alleged constitutional violation, and, in the alternative, plaintiff has failed to demonstrate that the discrimination was purposeful or intentional. Def. Mem. of Law at 21. Defendants also argue that his equal protection claim is duplicative of his free exercise claim. Id. at 22.

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly-situated persons be treated equally. See City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005) ("To prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").

> [T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

Vegas v. Artus, 610 F. Supp. 2d 185, 209 (N.D.N.Y. 2009) (internal quotation marks and citations omitted).

If an individual cannot "allege membership in [a protected] class, he or she can still prevail in . . . a class of one equal protection claim." Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005) (internal quotation marks and citations omitted). To succeed, a plaintiff must show "that [he] [was] intentionally treated differently from other similarly-situated individuals without any rational basis." Clubside, Inc. v.

Valentin, 468 F.3d 144, 158-59 (2d Cir. 2006).  Additionally, plaintiffs must establish an extremely high "level of similarity between plaintiffs and the persons with whom they compare themselves . . . ."  Neilson, 409 F.3d at 104. "Generally, whether parties are similarly situated is a fact-intensive inquiry" best suited for the jury unless "no reasonable juror could find that the persons to whom plaintiff compares itself are similarly situated," and then summary judgment is appropriate.  Id. (citations omitted).

Although there is some question in the record as to whether the weekly Rastafarian religious classes offered were suitable for worship services, see subsection II.C.1.b. supra, there is no indication in the record that Supt. Smith or DSS Andrews were motivated by a discriminatory animus.  See Bussey v. Phillips, 419 F. Supp. 2d 569, 581 (S.D.N.Y. 2006) ("A plaintiff can plead intentional discrimination on the basis of race in several ways, including by identifying a law or policy that expressly classifies persons on the basis of race, a facially neutral law or policy that has been applied in an intentionally discriminatory manner, or a facially neutral statute or policy that has an adverse effect and is motivated by discriminatory animus.").  As plaintiff cannot demonstrate intentional or purposeful discrimination, it is recommended that defendants' motion on this ground be granted.

**F. Supervisory Liability**

Plaintiff contends that Supt. Smith was "made aware of there being a systematic, gross inadequacies in training, and supervision of his employees in pat-frisking, procedures, knowledge of the Rastafarian religion, training in allowing [him] to access the law library and/or courts, adequate training in providing medical care." Am. Compl. at 27.  Defendants argue that Supt. Smith "was not involved in the day-to-day nuts-and-bolts of facility operations," and relied on his staff to ensure the efficient operation of the facility. Def. Mem. of Law at 24.  Supervisory officials may not be held liable for their subordinates' constitutional violations merely because they are in a position of authority.  See Black v. Coughlin, 76 F.3d 72, 74 (2d Cir.

1996). In this Circuit, the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991) (additional citations omitted)). However, supervisory personnel may be considered personally involved in their subordinate's conduct if:

> (1) the defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (additional citation omitted)).[29] Absent a subordinate's underlying constitutional violation, there can be no supervisory liability. See Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see also Elek v. Inc. Vill. of Monroe, 815 F. Supp. 2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because [p]laintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability.").

　　　Plaintiff suggests that Supt. Smith "was made aware of the unconstitutional violations via written

---

[29] Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011), rev'd in part on other grounds sub nom. Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (summary order) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

communications, and through appeals of grievances that Smith rendered decisions on[,] as well as numerous conversations plaintiff had with [Supt.] Smith when he made rounds in the prison." Pl. Opp. at 23. To the extent that plaintiff seeks to establish Supt. Smith's knowledge of his complaints regarding pat frisks and procedures, access the law library and/or courts, and failure to provide adequate medical care through sending letters, this argument must fail. It is well-settled that merely writing letters and grievances to a defendant is insufficient to establish personal involvement. See Smart v. Goord, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006) ("Commissioner . . . cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] . . . ."); Johnson v. Wright, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) ("It is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold the official liable for the alleged violation.") (quotations omitted). Similarly, receipt of a letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. See, e.g., Rivera v. Fischer, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) ("Numerous courts have held that merely writing a letter of complaint does not provide personal involvement necessary to maintain a § 1983 claim.") (citing cases). Although case law affirms that at the pleading stage, a plaintiff may establish personal involvement of a defendant if he can demonstrate that he sent the letter to defendant "at an appropriate address and by appropriate means," Grullon v. City of New Haven, 720 F.3d 133, 141 (2d Cir. 2013), the standard is heightened on a motion for summary judgment. See Braham, 2017 WL 3222532, at *13 (detailing the heightened summary judgment standard). "Once the defendant moves for summary judgment, [ ] a plaintiff must provide evidence to support his claim that the defendant in fact received the letter, had actual knowledge of the risk of harm or unconstitutional conditions, and failed to make any effort to remedy the conditions or to prevent or protect the plaintiff from the harm." Id. Plaintiff has not proffered evidence, and there is no indication in the record, that Supt. Smith received and/or read plaintiff's letters regarding pat frisks and procedures, access the law

92

library and/or courts, and failure to provide adequate medical care; in fact, Supt. Smith declared that an inmate's written requests or complaints "were forwarded to the appropriate deputy superintendent, directly to the medical department or other appropriate supervisor with direction from me to look into the complaint for review, investigation and address i[t] appropriately." Smith Decl. ¶ 22. Moreover, Supt. Smith stated that he had "no specific recollection of [p]laintiff making [him] aware of repeated violations of his constitutional rights, specific to denial of access to the courts and/or generalized complaints of violations." Id. ¶ 14.

However, Supt. Smith acknowledges his involvement in the grievance investigation of plaintiff's First Amendment free exercise claims involving the lack of weekly Rastafarian religious services. Smith. Decl. ¶ 6 ("I submitted a determination via memorandum dated 12/19/13 in response to a Grievance #28649-13 . . . ."). It has been held that "when a supervisory prison official receives a particular grievance, personally reviews it, and responds and/or takes action in response, such conduct may constitute sufficient 'personal involvement' to establish individual liability for the alleged constitutional violation." Young v. Choinski, 15 F. Supp. 3d 172, 191-92 (D. Conn. 2014) (citing inter alia Lewis v. Wallace, No. 9:11-CV-0867 (DNH/DEP), 2013 WL 1566557, at *5 (N.D.N.Y. Feb. 22, 2013) (recognizing that "courts in this circuit have held that personal involvement may be found where a supervisor receives, reviews, and responds to a plaintiff's grievance"), report and recommendation adopted, No. 9:11-CV-0867 (DNH/DEP), 2013 WL 1566555, at *1 (N.D.N.Y. Apr. 12, 2013); Cole, 2012 WL 4491825, at *22 (N.D.N.Y. Aug. 31, 2012) (concluding that a supervisor's memoranda responding to plaintiff's complaints were sufficient to establish his personal involvement). Thus, the record is clear that Supt. Smith was personally invovled in plaintiff's free exercise claim regarding Rastafarian religious services.

Insofar as plaintiff contends that Supt. Smith failed to "ensure[ ] that his employees were adequately and properly supervised and trained in proper pat frisk procedures, conducting proper cell searches, allowing

prisoners to access . . . religious meals, law library, medical care," Pl. Opp. at 24, such allegations, unsupported by the record, do not amount to personal involvement.  See Samuels v. Fischer, 168 F. Supp. 3d 625, 639 (S.D.N.Y. 2016) ("A general allegation that [the supervisory officials] failed to train subordinates, however, is insufficient to establish personal involvement, absent some factual connection between their failure to train and the harm that eventually befell Plaintiff."); see Shepherd v. Fischer, No. 9:10-CV-1524 (TJM/DEP), 2015 WL 1246049, at *13 (N.D.N.Y. Feb. 23, 2015) ("Shepherd I") (concluding that the plaintiff's claims that the supervisory defendants "acting alone and/or in conjunction with each other [,] were aware of there being a systematic, gross inadequacies in training as well [as] supervision of subordinates in the use of force, and further failed to take corrective as well as preventative measures, which caused the violation of [the] plaintiff's rights" were too conclusory to establish personal involvement) (first alteration in original) (internal quotation marks omitted).  Plaintiff may not name and attempt to hold liable Supt. Smith merely because he holds a position of authority within the prison system without substantiating claims against him.  See Colon, 58 F.3d at 874 ("The bare fact that [the defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain Colon's claim.").

Accordingly, it is recommended that defendants' motion based on lack of personal involvement of Supt. Smith as to plaintiff's claims regarding pat frisks and procedures, access the law library and/or courts, and failure to provide adequate medical care be granted.  It is further recommended that, insofar as defendants' motion relating to personal involvement is based on plaintiff's claims regarding weekly Rastafarian religious services, the motion be denied.

### G. Eleventh Amendment Immunity

Defendants argue that they are entitled to Eleventh Amendment immunity relating to plaintiff's claims for money damages against them in their official capacities.  Def. Mem. of Law at 27.  The Eleventh

94

Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. Halderman, 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. See Quern v. Jordan, 440 U.S. 332, 340-41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. Farid v. Smith, 850 F.2d 917, 921 (2d Cir. 1988) (citing Edelman v. Jordan, 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. Kentucky v. Graham, 473 U.S. 159, 166 (1985). Here, because plaintiff seeks monetary damages against defendants for acts occurring within the scope of his duties, the Eleventh Amendment bar applies.

Accordingly, it is recommended that defendants' motion on this ground be granted.

### III. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby

**RECOMMENDED**, that defendants' Motion for Summary Judgment (Dkt. No. 107) be **GRANTED IN PART**:

95

(1) Insofar as it seeks dismissal for failure to exhaust, plaintiff's: (a) First Amendment free exercise claims against C.O. Hoffman; (b) First Amendment access to the courts claims against Supt. Smith, DSP Andrews, C.O. Heister, and C.O. Marasco; (c) First Amendment retaliation claims against Lt. Palen, Sgt. Keane (as to the October 9, 2013 incident), Sgt. Lelleck, Sgt. Deacon, C.O. Marasco, C.O. Hoffman, C.O. Phillips; (d) Eighth Amendment deliberate indifference claims against Supt. Smith and C.O. Heister; and (e) Fourteenth Amendment due process claims against Lt. Palen;

 (2) Insofar as it seeks dismissal of plaintiff's First Amendment free exercise claims against C.O. Alagrin, C.O. Hoffman, and C.O. Blyth;

(3) Insofar as it seeks dismissal of plaintiff's First Amendment access to the courts claims against C.O. Pearson, Sgt. Keane, and C.O. Alagrin;

(4) Insofar as it seeks dismissal of plaintiff's First Amendment retaliation claims against C.O. Alagrin, C.O. Lange, C.O. Blyth, C.O. Phillips, C.O. Hoffman, C.O. Pearson, C.O. Morgenthaler, C.O. Heister, Sgt. Keane, Sgt. Lelleck, Sgt. Deacon, Lt. Gardner, Lt. Palen, and Dr. Lee;

(4) Insofar as it seeks dismissal of plaintiff's Eighth Amendment conditions of confinement claim against C.O. Lange;

(5) Insofar as it seeks dismissal of plaintiff's Eighth Amendment excessive force claims against C.O. Strang, C.O. Alagrin, C.O. Zibler, and C.O. Hoffman;

(6) Insofar as it seeks dismissal of plaintiff's Eighth Amendment sexual assault claim against C.O. Hoffman;

(7) Insofar as it seeks dismissal of plaintiff's Eighth Amendment failure to intervene claim against C.O. Phillips;

(8) Insofar as it seeks dismissal of plaintiff's Eighth Amendment deliberate  indifference claim against Dr. Lee, C.O. Morgenthaler, and C.O. Zibler;

(9) Insofar as it seeks dismissal of plaintiff's Fourteenth Amendment due process claim against Lt. Gardner and Lt. Palen;

(10) Insofar as it seeks dismissal of plaintiff's Fourteenth Amendment equal protection claim against Supt. Smith and DSP Andrews;

(11) Insofar as it seeks dismissal of plaintiff's supervisory liability claims relating to pat frisks and procedures, access the law library and/or courts, and failure to provide adequate medical care against Supt. Smith;

the motion be **GRANTED**, and the claims be **DISMISSED** with prejudice; and it is further

**RECOMMENDED**, that defendants' Motion for Summary Judgment (Dkt. No. 107) be **DENIED IN PART**:

(1) Insofar as it seeks dismissal of plaintiff's First Amendment free exercise claims against Supt. Smith, DSP Andrews, and Mr. Rapp;

(2) Insofar as it seeks dismissal of plaintiff's First Amendment retaliation claims against C.O. Strang and C.O. Zibler;

(3) Insofar as it seeks dismissal of plaintiff's Eighth Amendment sexual assault claims against C.O. Strang and C.O. Zibler,

the motion be **DENIED**; and it is

**ORDERED**, that the Clerk of the Court update the docket to reflect the spelling used in this Report-Recommendation and Order: (1) Strange to Strang; (2) Langerdorf to Lange; (3) Morasco to Marasco; and (4) Blythe to Blyth; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on the parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).[30]

Dated: June 13, 2018
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[30]  If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).